IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
CIVIL DIVISION

JAMESON LAND COMPANY, LLC,
a Florida limited liability company,

       Plaintiff,                  CASE NO.: 8:15-cv-00409-JDW-EAJ

vs.

MOSAIC FERTILIZER, LLC, a Delaware
limited liability company,

       Defendant.
_____/

## AMENDED COMPLAINT AND JURY TRIAL DEMAND

The plaintiff, Jameson Land Company, LLC ("Jameson"), through its undersigned counsel, hereby sues the defendant, Mosaic Fertilizer, LLC ("Mosaic"), and alleges:

## GENERAL ALLEGATIONS

### Preliminary Statement and Overview

1.      This lawsuit is based on wrongful acts of Mosaic relating to real property owned by Jameson, more fully described below, located in Hillsborough and Polk Counties.

2.      Mosaic leased the property from Jameson's predecessor in title, and used the property for mining and related purposes. Mosaic's ability to use the property has expired. Mosaic, however, has failed to timely surrender and reclaim or restore the property. Further, Mosaic has committed several wrongful acts with respect to the property including, but not limited to, the following:

          a.      Attempting to obtain title to portions of Jameson's property by (i) representing to Jameson's predecessor that Mosaic owned the property (when Mosaic

was fully aware that it did not), and (ii) demanding that Jameson's predecessor obtain quit claim deeds from Jameson, and deliver the deeds to Mosaic;

b. Granting utility and other easements which encumber portions of Jameson's property without obtaining authorization from Jameson or its predecessors;

c. Causing or allowing the release or discharge of pollutants and hazardous substances, including Arsenic, Cadmium, Chromium, Iron and Lead, onto portions of Jameson's property, and into the groundwater thereunder;

d. Failing to inform or warn Jameson, and actively concealing from Jameson, that pollutants and hazardous substances had been released onto and under portions of Jameson's property;

e. Misrepresenting to authorities, including the Environmental Protection Agency and Florida Department of Environmental Protection, that Mosaic owns portions of Jameson's property, resulting in, among other things, the entry of consent orders, and placement of monitoring wells on the property; and

f. Using portions of Jameson's property to qualify for state and federal permits and other benefits without authorization.

3. Mosaic's actions have caused significant damage to Jameson.

**<u>Parties, Jurisdiction, and Venue</u>**

4. This is an action for, among other things, damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

5. Jameson is a Florida limited liability company with its principal place of business located in Lakeland, Florida.

6.      Mosaic is a Delaware limited liability company with it principal place of business located in Plymouth, Minnesota, which conducts business in Florida, including, but not limited to, Hillsborough County, and Polk County, Florida.

7.      Certain of Mosaic's predecessors, parents, subsidiaries, agents, or affiliates concerning the matters at issue are described below:

a.      International Minerals & Chemical Corporation, f/k/a International Agricultural Corporation ("International"), is an inactive New York corporation. International first transacted business in the State of Florida in 1912, and continued to do so through December 24, 1998.

b.      International is the earliest predecessor, and prior parent company, of Mosaic Global Inc., a Delaware corporation, f/k/a IMC Global Inc., f/k/a IMC Fertilizer Group, Inc. ("Mosaic Global").

c.      Mosaic Global was formed as a publicly traded company in 1988 when International divested its fertilizer assets (as described below).

d.      In 1993, (i) IMC Fertilizer, Inc., n/k/a Mosaic Global Operations Inc., a wholly-owned subsidiary of Mosaic Global, and (ii) Freeport-McMoRan Resource Partners, Limited Partnership, entered into a joint venture partnership and created IMC-Agrico Company, n/k/a IMC Phosphates Company, a Delaware general partnership (the "Partnership").

e.      The Partnership conducted business through its managing partner, IMC-Agrico MP, Inc., a Delaware corporation ("Managing Partner"). The Managing Partner first transacted business in the State of Florida in 1993, and continued to do so until December 1, 2005.

f.     The Mosaic Company ("Mosaic Co.") is a Delaware corporation incorporated in March, 2004 to serve as the parent company of the business that was formed through the business combination of Mosaic Global and the fertilizer businesses of Cargill, Incorporated ("Cargill") (described below). Mosaic Co. first transacted business in the State of Florida in 1998, and continued to do so until December 22, 2005.

g.     On October 22, 2004, pursuant to the Agreement and Plan of Merger and Contribution dated as of January 26, 2004 by and among Mosaic Global, Mosaic Co., GNS Acquisition Corp. (a wholly-owned subsidiary of Mosaic Co.) ("GNS"), Cargill and Cargill Fertilizer, Inc., as amended by Amendment No. 1 to Agreement and Plan of Merger and Contribution, dated as of June 15, 2004, and as subsequently amended by Amendment No. 2 to Agreement and Plan of Merger and Contribution, dated as of October 18, 2004 (the "Merger and Contribution Agreement"): (i) GNS merged with and into Mosaic Global (the "Merger"), with Mosaic Global surviving the Merger, and (ii) Cargill and certain of its affiliates (the "Cargill Contributing Corporations") contributed equity interests in certain entities owning all or substantially all of Cargill's fertilizer businesses (the "Combination").

h.     Upon completion of the Merger, Mosaic Global became a wholly-owned subsidiary of Mosaic Co., resulting in a change of control of Mosaic Global.

i.     One of the Cargill Contributing Corporations was Cargill Fertilizer, LLC ("Cargill Fertilizer"), a Delaware limited liability company.

j.     On or about October 28, 2004, Cargill Fertilizer changed its name to Mosaic Fertilizer, LLC.

8.      Mosaic is subject to personal jurisdiction in the State of Florida pursuant to *Florida Statutes* § 48.193 because, without limitation, Mosaic (a) operated, conducted, engaged in, or carried on business in Florida, or engaged in substantial and not isolated activity within Florida; (b) committed tortious acts within Florida, individually or through its agents; and (c) breached a contract in Florida by failing to perform acts required by the contract in Florida.

9.      Venue is proper in the Middle District of Florida ("District") because some of the causes of action accrued within this District, and certain property in this litigation is located within this District.  Diversity jurisdiction exists as alleged in Mosaic's Notice of Removal (Dkt. 1).

## The Jameson Property

10.      At all times material, Jameson or its predecessors in title owned fee simple title to portions of real property located in Section 14, Township 31 South, Range 23 East in Polk County, Florida, including, without limitation, the following (the "Polk Jameson Property"):

Parcel 1

Lots 1 through 16, inclusive, A.J GARDNER ADDITION, according to the map or plat thereof as recorded in Plat Book 33, Page 15, of the Public Records of Polk County, Florida.

Parcel 2

The East 1126 feet of the NE 1/4 of the NE 1/4 of Section 14, Township 31 South, Range 23 East, Polk County, Florida, (being all of the NE 1/4 of NE ¼ except right-of-way and property of the Seaboard Air Line Railroad Company along the west side thereof, said right-of-way and property having been conveyed by J.H. Kirkland and wife to the Charlotte Harbor & Northern Railway Company under deed dated April 19, 1910, recorded in Deed Book 99, Page 38, Polk County, Florida).

The NW 1/4 of the NE 1/4 of said section 14, Township 31 South, Range 23 East, Polk County Florida, subject to right-of-way of the Seaboard Air Line Railroad Company along the east side thereof, and less a triangular parcel in the northeast corner thereof described as:  Begin at the intersection of the north boundary of said Section 14 with the west right-of-way line of the Seaboard Air Line Railroad Company, run thence south

along said right-of-way line 471.24 feet, thence northwesterly 486.45 feet to the north boundary of said Section 14 at a point 122.14 feet west of the point of beginning, thence east 122.14 feet to the point of beginning, and less the north 400 feet of the West 658.5 feet thereof.

The E 1/2 of the NE 1/4 of NE 1/4 of NW 1/4 of said Section 14, Township 31 South, Range 23 East, Polk County, Florida, subject to right of way for State Road 37, Less the north 400 feet thereof.

The North 25 feet of the E 1/2 of SE 1/4 of NE 1/4 of NW 1/4 of said Section 14, Township 31 South, Range 23 East, Polk County, Florida subject to right of way for State Road 37.

Parcel 3

Lots 1, 4, 5 and 8, Block 22; All of Block 23; Lots 3, 4, 5 and 6, Block 24; Lots 5, 6, 7, 8, 9, 10, 11 and 12, Block 25; Lots 3, 4, 5 and 6, Block 26; All of Blocks 27, 28 and 29, BRADLEY JUNCTION, according to the map or plat thereof as recorded in Plat Book 2, page 39 and Plat Book 3, Page 9, of the public records of Polk County, Florida.

Parcel 4

The E 1/2 of SW 1/4; the N 1/2 of SE 1/4 of NW 1/4 of SW 1/4; the S 1/2 of SE 1/4 of SW 1/4 of SW 1/4, all lying in Section 12, Township 31 South, Range 23 East, Polk County, Florida, less road right-of-way.

That part of the NE 1/4 of SW 1/4 of SW 1/4 lying east on Leon M. Kirkland Subdivision, Bradley Junction, Florida, according to the plat thereof recorded in Plat Book 30, Page 7, public records of Polk County, Florida, otherwise described as: Begin at the northeast corner of Leon M. Kirkland Subdivision (which point is 875 feet east of the northwest corner of the SW 1/4 of SW 1/4 of said Section 12), run thence South 220 yards (660 feet) to the south boundary of said NE 1/4 of SW 1/4 of SW 1/4, thence east along said boundary 143 1/3 yards (430 feet) to the point of beginning, lying and being in Section 12, Township 31 South, Range 23 East, Polk County, Florida.

Parcel 5

The NW 1/4 of the NW 1/4 Section 11, Township 31 South, Range 23 East, Polk County, Florida, less road right-of-way.

Parcel 6

Part of the NE 1/4 of SE 1/4 of SE 1/4 of said Section 11, Township 31 South, Range 23 East, Polk County, Florida, described as: Begin at a point 279.56 feet west of the northeast corner of said NE 1/4 of SE 1/4 of SE 1/4 (said point being the northwest corner of A.J. Gardner Addition), run thence west 278.04 feet (to the boundary of

Bradley Junction), thence south 460 feet, thence east 278.04 feet, thence north 460 feet to the point of beginning.

Part of the E 1/2 of SE 1/4 of SE 1/4 of said Section 11, Township 31 South, Range 23 East, Polk County, Florida, described as: Begins at the southeast comer of said section, run thence North 865.7 feet, thence west 284 feet, thence south 475 feet, thence west 276.7 feet, thence south 390 feet, more or less, to the south boundary of said Section 11, thence east along said boundary 560 feet, more or less, to the point of beginning, LESS that part thereof, if any, acquired by F.J. Smith under a tax deed dated June 22, 1931, Deed Book 478, Page 7, public records of Polk County, Florida, less road right-of-way.

Part of the E 1/2 of SE 1/4 of SE 1/4 of said Section 11, Township 31 South, Range 23 East, Polk County, Florida, described as: Begin 490.3 feet south and 284 feet west of the northeast corner of said SE 1/4 of SE 1/4, run thence south 475.7 feet, thence west 276.7 feet, thence north 88 feet, thence east 104 feet, thence north 287.6 feet, thence east to the point of beginning.

11.     Additionally, at all times material, Jameson or its predecessors in title owned fee simple title to a portion of real property located in Sections 1 and 9 of Township 31 South, Range 22 East in Hillsborough County, Florida, including the property described below (the "Hillsborough Jameson Property") (with the Polk Jameson Property, the "Jameson Property"):

Parcel 1

The NW 1/4 of the NE 1/4 of Section 1, Township 31 South, Range 22 East, Hillsborough County, Florida.

Parcel 2

The SE 1/4 of the NE 1/4; the NW 1/4; the S 1/2 of NE 1/4 of NE 1/4; the NW 1/4 of NE 1/4, LESS one acre square in the southwest corner thereof; the N 1/2 of SW 1/4, LESS that part of the NW 1/4 of SW 1/4 lying south and west of the old, existing road (running in a southeasterly-northwesterly direction); N 1/2 of SW 1/4 of NE 1/4; The NE 1/4 of SE 1/4, Less the north 315 feet of the west 420 feet thereof, and the south 630 feet of the east 210 feet of the NW 1/4 of SE 1/4; and that part of the SE 1/4 of the SW 1/4 described as: begin 1043.55 feet north of the southeast corner thereof, run thence west 1043.55 feet, thence northwesterly to the northwest corner thereof, thence east to the northeast corner thereof, thence south to the point of beginning, less road right-of-way, all lying and being in Section 9, Township 31 South, Range 22 East, Hillsborough County, Florida.

## The Lease

12.      The First National Bank of Tampa (the "Bank") previously owned and leased to International certain land in Polk and Hillsborough Counties, including the Jameson Property.

13.      More specifically:

      a.      On or about December 22, 1964, the Bank and Mosaic's predecessor in interest, International entered into a Lease, attached as **Exhibit A**, pursuant to which the Bank leased to International certain property located in Polk County (the "1964 Lease");

      b.      On or about October 6, 1965, the Bank and International entered into a Lease, attached as **Exhibit B**, pursuant to which the Bank leased to International certain additional property located in Polk County (the "1965 Lease") (with the 1964 Lease, the "Lease"); and

      c.      Between 1965 and 1966, the 1965 Lease was supplemented to include the lands in the Polk Jameson Property and the Hillsborough Jameson Property. Copies of the supplements are attached as part of Exhibits A and B.

14.      The 1964 Lease term commenced on December 22, 1964 and continued through January 1, 1973, and subsequently was extended by the parties.

15.      The 1965 Lease term commenced on October 6, 1965 and continued through December 31, 1975, and subsequently was extended by the parties.

16.      During the term of the Lease, the Tenant was permitted to use the lands in the manner described in the Lease.

17.      In doing so, however, the Tenant was required to, among other things: (a) "not infringe upon or violate any rights which any third persons or adjoining owners may have in the [subject] lands"; (b) "comply with and conform to all pertinent laws, rules, orders and

regulations"; and (c) "not permit or allow the creation of any liens upon or claims against the [subject] lands." *(See* Lease at ¶¶ 1.2 and 1.3.)

18.     Moreover, the Lease expressly provides:

a.      Pursuant to ¶ 4.6 of the Lease, the Tenant agreed that, upon the expiration of the Lease term, "whether original or as expanded or extended," the Tenant would "surrender up the [subject] lands to Lessor without demand or notice";

b.      Pursuant to ¶ 5.1 of the Lease, the Tenant agreed to "keep and save Lessor and all persons claiming by, through or under it harmless and indemnified from and against all liability, loss, cost, fines, penalties and damage of every kind and character, including court costs and attorneys' fees, to which it or they may be subjected by virtue of their ownership of or interest in said lands, or by virtue of Lessee's use thereof or operations thereon, arising during the term of [the Lease] and for a period of one year thereafter" (this being a continuing obligation under which recoveries may be had during the Lease term or at any time thereafter);

c.      Pursuant to ¶ 6.1 of the Lease, the Tenant agreed that, in the event of any default, (i) the Tenant would be entitled remove the Lessee from the subject lands, by action at law or in equity, and (ii) the Tenant would be liable for, and pay to the Lessor, among other things, the expenses necessary to restore the lands to a rentable or usable condition; and

d.      Pursuant to ¶ 7.1 of the Lease, the Tenant agreed that it would not "assign, transfer, convey, sub-lease or in any way dispose of its rights and obligations under [the Lease] without first procuring the written consent of Lessor . . . . "

19.     Jameson is the owner of the Jameson Property, and is the successor to the Lessor under the Lease. Jameson also owns and holds all right, title and interest in and to all claims, interests, choses in action and intangibles in or concerning, *inter alia,* the Jameson Property.

20.     Mosaic is the successor to the Tenant under the Lease.

21.     Mosaic continues using portions of the Jameson Property by conducting processing, holding, clay settling, wetland mitigation, hazardous and solid waste placement, reclamation and other operations on, about and through the property.

**Mosaic's Erroneous Demand for Deeds to the Jameson Property**

22.     Jameson acquired the Jameson Property in December 2010.

23.     Upon its acquisition of the Jameson Property, Jameson commenced efforts to market and otherwise deal with the property.

24.     On January 25, 2013, Mosaic served a demand letter on certain of Jameson's predecessors in title, Nirvana Minerals, LP and The Greg & Nancy Vance Family Limited Partnership (the "Jameson Property Sellers").

25.     Specifically, Mosaic demanded that the Jameson Property Sellers obtain from Jameson deeds to all of the real property sold by them to Jameson*,* including the Hillsborough Jameson Property and the Polk Jameson Property (the "Mosaic Demand").  A copy of the Mosaic Demand is attached as **Exhibit C**.

26.     The Mosaic Demand wrongfully claimed that (a) Mosaic, and not Jameson, owned fee title to all of the real property conveyed to Jameson by the Jameson Property Sellers; and (b) Jameson's deed from the James Property Sellers created "an additional cloud on Mosaic's chain of title."

27.     The Mosaic Demand was inaccurate and clouded and slandered the title to the Jameson Property.

28.     Mosaic had no legal of factual basis for serving the Mosaic Demand.

29.     Subsequent to Mosaic's erroneous demand, Jameson expended attorneys' fees to counteract the Mosaic Demand and further investigate its rights in and to the Jameson Property, discovering that Mosaic had committed several other wrongful acts regarding the property.

<u>**Mosaic's Erroneous Grants of Easements**</u>

30.     Jameson discovered that Mosaic or its predecessors previously, and without any right or permission, granted easements over and across certain portions of the Jameson Property.

31.     For example:

a.     On November 12, 1991, IMC Fertilizer, Inc., n/k/a Mosaic Global Operations Inc. ("<u>IMC Fertilizer</u>"), granted an easement over parcels 2 and 4 of the Polk Jameson Property (the "<u>1991 Easement</u>"), which was recorded in Official Records Book 3033, Page 0442, of the public records of Polk County, Florida (the "<u>1991 Easement Deed</u>").  A copy of the 1991 Easement Deed is attached as **Exhibit D.**

b.     On September 24, 1997, IMC Fertilizer granted an easement over parcel 2 of the Polk Jameson Property (the "<u>1997 Easement</u>"), which was recorded on September 24, 1997 in Official Records Book 3903, Page 1573, of the public records of Polk County, Florida (the "<u>1997 Easement Deed</u>").  A copy of the 1997 Easement Deed is attached as **Exhibit E.**

c.     On June 16, 2000, the Partnership, through its Managing Partner, granted an easement over, among other parcels of land, parcel 2 of the Polk Jameson Property to Florida Gas Company (the "<u>2000 Easement</u>"), which was recorded on January 20, 2004,

in Official Records Book 05656, Page 1525, of the public records of Polk County, Florida (the "2004 Easement Deed").  A copy of the 2004 Easement Deed is attached as **Exhibit F.**

32.    Neither Jameson nor its predecessors in fee title authorized, consented or ratified the grant of the 1991 Easement, 1997 Easement, or 2000 Easement.

33.    Accordingly, (a) IMC Fertilizer was not authorized or permitted to grant the 1991 Easement or the 1997 Easement; and (b) the Partnership and its Managing Partner were not authorized, and had no authority to grant the 2000 Easement.

34.    In sum, the granting of the 1991 Easement, the 1997 Easement and the 2000 Easement occurred without authority or authority from, the fee simple owner of the Polk Jameson Property.

35.    Jameson owns and holds (a) fee simple title to the Polk Jameson Property encumbered by the 1991 Easement Deed, the 1997 Easement Deed, and the 2004 Easement Deed pursuant to, among other things, that certain instrument recorded in Official Record Book 08302, Pages 1246-1249 of the public records of Polk County; and (b) all right, title and interest in and to all claims, interests, choses in action and intangibles in or concerning, *inter alia,* the property.

36.    This is not the first instance whereby Mosaic has engaged in improper conduct concerning the property or easement rights of third-parties. *See Mims/Alafia, LLC v. Mosaic Fertilizer, LLC,* Case No. 8:05-cv-2271-T-26EAJ (M.D. Fla. June 14, 2007) (ordering judgment in favor of the plaintiff on its claim for slander of title based upon Mosaic's interference with plaintiffs claimed easement rights in Polk County, Florida).

## Mosaic's New Wales Facility and Misrepresentations

37.     Mosaic and its predecessors have engaged in additional improper conduct in connection with Mosaic's New Wales Facility, located in Polk County ("Facility").

38.     Mosaic and its predecessors began operating the Facility in 1975.

39.     The Facility lies in the watershed of the Alafia River System, which is designated by the Florida Department of Environmental Protection ("FDEP") as a Class III freshwater body.

40.     Two tributaries, Mizelle Creek and George Allen Branch, carry waters away from the vicinity of the Facility.

41.     The Facility includes: (a) the Main Plant; (b) the closed, unlined North Gypsum Stack; (c) the active, lined South Gypsum Stack; and (d) an unlined Auxiliary Holding Pond.

42.     The Facility and its operation are subject to various regulatory requirements, permits, approvals and authorities including: the U.S. Environmental Protection Agency (the "EPA"), the FDEP, Army Corps of Engineers, and water management districts.

43.     The Facility is a recognized "Large Size Hazardous Waste Generator," and is subject to a Large Size Hazardous Waste Generation Permit.

44.     As part of the permitting process for mining, wastewater and hazardous waste, Mosaic is required to attest and provide, under penalty of perjury, a description of the lands it owns, together with lands owned by others within a one mile radius of the Facility.

45.     In order to obtain necessary permits, Mosaic provided false information within permit applications by claiming ownership of certain portions of the Jameson Property.

46.     Mosaic has thereby, among other things, erroneously subjected the Jameson Property to regulatory action.

47.     Similarly, Mosaic has (a) misrepresented, to the detriment of Jameson, Mosaic's interest or claimed interest in the subject portions of the Jameson Property; and (b) failed to comply with, and disregarded, notification requirements ordered by federal and state agencies.

48.     For example, and as more fully described below, the EPA previously issued an Administrative Order on Consent (the "EPA Consent Order"), a copy of which is attached as **Exhibit G.**

49.     In connection therewith, on or about June 20, 2011, Mosaic represented that:

> To the extent that activities required by this Consent Order, or by any approved Workplan(s) prepared pursuant hereto, must be done on property not owned or controlled by Respondent, Respondent will use best efforts to obtain site access agreements in a timely manner from the present owners of such property. Best efforts, as used in this paragraph, shall include the payment of reasonable compensation in consideration of granting access. Respondent shall provide EPA's Project Coordinator with a copy of any access agreements."

(EPA Consent Order, § XIII, ¶ 59.)

50.     Mosaic's representation in the preceding paragraph was false.

51.     The referenced consent order or approved workplans have required activities on portions of the Jameson Property. Mosaic accessed the Jameson Property, installed monitoring wells and performed soil borings on the Jameson Property without Jameson's (or its predecessor's) consent.

52.     Mosaic also has provided documents to federal and state agencies falsely representing that Mosaic owned or controlled certain portions of the Jameson Property. *(See* Mosaic's September 20, 2011 Sampling and Analysis Workplan, a copy of which is attached as **Exhibit H**.)

53.     Mosaic' representations of ownership and control of certain portions of the Jameson Property are false, and were known to be false at the time the statements were made.

## Mosaic's Contamination of Parcel 1 of the Hillsborough Jameson Property

54.     Mosaic continues using the Hillsborough Jameson Property for, among other things, processing, recovery and removing operations, clay settling, and the disposition of tailings, slimes and other waste and hazardous substances.

55.     The Facility operations and waste management practices have been environmentally unsound and that, as a result, hazardous waste and hazardous substances including Cadmium, Lead, Chromium and Arsenic have migrated from the site into adjacent land, and onto and under Parcel 1 of the Hillsborough Jameson Property.

56.     Mosaic's operations also have resulted in exposing Parcel 1 of the Hillsborough Jameson Property to higher concentrations of mineralization such as iron, aluminum and barium.

57.     On October 20, 2008, Mosaic received Warning Letter #08-006PM53BMR issued by the FDEP, Bureau of Mine Reclamation Phosphate Management Program (Department) (the "Warning Letter").

58.     The Warning Letter reported, among other things, the presence of violations associated with Mosaic's National Pollutant Discharge Elimination System permit.

59.     In December 2009, Mosaic, without notification or consent, constructed monitoring wells on Parcel 1 of the Hillsborough Jameson Property, including MC MW-4, MC MW-4A, and a surface water sampling station at SP-2.

60.     About 2010, the FDEP opened an enforcement action with File Number 10-1560 to address environmental and hazardous waste concerns caused by Mosaic's operation of the Facility that impacted Mizelle Creek (the "FDEP Action").

61.     From the FDEP Action, Mosaic received a Consent Order (the "<u>FDEP Consent Order</u>") requiring Mosaic to take immediate action to monitor, sample and remediate contaminated soils, surface water and groundwater within the Mizelle Creek watershed.

62.     The compliance wells identified by Mosaic in reports filed under the Consent Order on Parcel 1 of the Hillsborough Jameson Property indicate that Mosaic has not achieved compliance with state soil and water quality standards.

63.     Similarly, about June 2011, the EPA initiated a proceeding under Section 3013(a) of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6934(a), styled *In re Mosaic Fertilizer, LLC, New Wales Facility, Mulberry, Florida 33860,* Docket No: RCRA-04-2011-4252 (the "<u>EPA Action</u>").

64.     During the EPA Action, Mosaic agreed to the EPA Consent Order, requiring Mosaic to take immediate action to monitor, sample and remediate contaminated soils, surface water and groundwater.

65.     The EPA Consent Order is binding upon Mosaic and its officers, directors, employees, agents, contractors, successors, and assigns.

66.     The EPA Consent Order included the following Findings of Fact:

    a.     Mosaic's facility covered by the Consent Order is approximately 2200 acres and is located at 3095 County Road 640 West, Mulberry, FL 33860. The facility began operation in 1975 under the ownership of International Mineral and Chemical Company.  On October 22, 2004, concurrent with the merger of the Cargill Fertilizer, LLC with IMC Global, the name of Cargill Fertilizer, LLC was changed to Mosaic Fertilizer, LLC.  Facility operations include the production of sulfuric acid, phosphoric acid, monoammonium phosphate ("MAP"), diammonium phosphate ("DAP"), and animal feed ingredients ("AFI"). Additional operations include a Phosphogypsum Stack System as defined in Rule 62-673.200(15), F.A.C. ("PGSS"), electric cogeneration, raw material storage and handling, wastewater storage and handling, process material handling and product shipping facilities.

b.　The primary operations at the facility are the production of sulfuric acid, phosphoric acid, DAP, MAP, and AFI. DAP and MAP are created by reacting phosphoric acid with ammonia to produce a granulated fertilizer primarily used for agricultural purposes. AFI are created by reacting phosphate rock with either limestone or soda ash.

c.　To produce sulfuric acid, the Facility burns molten sulfur to produce sulfur dioxide. The process to produce sulfuric acid is a double absorption process which uses a catalyst and absorption towers. Sulfuric acid is produced in the final absorption tower, diluted with water and temporarily stored as 98% acid.

d.　Phosphoric acid is produced by reacting sulfuric acid with phosphate rock (calcium fluoroapatite). The reaction produces phosphoric acid and calcium sulfate, commonly referred to as gypsum. During the reaction, precipitated crystals of gypsum are separated from the acid via filtration and rinsed to recover residual phosphoric acid. After rinsing, the gypsum is slurried with water and is pumped to the lined gypsum storage stack (gypstack).

e.　The gypsum slurry flows through an elevated ditch, called a rim ditch, into one of two ponded compartments atop the stack. After the gypsum settles out in the rim ditch and pond, the decanted process water is routed into the cooling pond system via a seepage collection and return water ditch that surrounds the stack.

f.　The Facility currently has one unlined closed gypstack and one lined active gypstack.

g.　The Facility's single cooling pond is a below-grade unlined pond.

h.　The surficial aquifer in this area is approximately 15 feet. Unless specific exemptions are permitted pursuant to Chapter 62-520, F.A.C., all ground water in the State of Florida must meet drinking water standards.

(EPA Consent Order, § IV, ¶¶ 11-16, 18, and 20.)

67.　The EPA Consent Order provides:

a.　That the Facility is a "facility or site" within the meaning of Section 3013(a) of RCRA, 42 U.S.C. § 6934(a), and as defined in 40 C.F.R. § 260.l0.

b.　Mosaic is a "person" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

c.　Mosaic is an "owner" and "operator" of the Facility located at 3095 County Road 640 West, Mulberry, Florida within the meaning of Section 3013(a) of RCRA, 42 U.S.C. § 6934(a).

d.    Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), defines the term "hazardous waste" to mean a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may: cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

e.    Section 1004(3) of RCRA, 42 U.S.C. § 6903(3), defines the term "disposal" to mean "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

f.    The regulations at 40 C.F.R. Section 260.10 define the term "hazardous waste constituent" to mean a constituent that caused the Administrator to list the hazardous waste in Part 261, Subpart D, or a constituent listed in Table 1 of Section 261.24.

g.    Based on the foregoing Findings of Fact, and pursuant to Section 3013(a) of RCRA, 42 U.S.C. § 6934(a), EPA has hereby determined that the release of hazardous wastes as defined by Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), at [Mosaic's] facility may present a substantial hazard to human health or the environment.

h.    EPA has further determined that Mosaic Fertilizer, as owner and operator of the Facility, is the party responsible for conducting the actions in the Consent Order, which were necessary to ascertain the nature and extent of any potential hazard to human health or the environment.

*(Id.* at § V, ¶¶ 21-23, and 25-29.)

68.    As a result, Mosaic was required to prepare a Sampling and Analysis Workplan for monitoring, testing, analysis, and reporting (the "Workplan").

69.    The Workplan was designed to determine the presence, magnitude, extent, direction, and rate of movement of any hazardous waste, hazardous constituents within and beyond the Facility boundary.

70.    The Workplan included testing and sampling of soils, groundwater and surface water within and beyond the boundary of the Facility.

71.    Parcel 1 of the Hillsborough Jameson Property is within the referenced boundary.

72.     Mosaic improperly constructed and still maintains monitoring wells on the northwest comer of the Hillsborough Jameson Property.

73.     Monitoring wells were installed at those locations because Mosaic had misrepresented that it owned or controlled that land. In fact, and as Mosaic was aware, it did not own or control that land.

74.     To obtain the permit for the wells, Mosaic had to be the record owner of the land upon which the wells would be placed.

75.     Because Mosaic knew that it was not the record owner of the land on which the EPA had directed the wells be placed, Mosaic pulled a permit for MW4 and MW4A approximately 500 feet to the north, on Mosaic's property.

76.     However, when Mosaic received its permit, it constructed the test sites in the location required by the EPA consent order, which was not the permitted location.

77.     Mosaic has actively used Parcel 1 of the Hillsborough Jameson Property as a necessary part of the Facility operations.

78.     The site area around the Facility drains towards Mizelle Creek, which is contiguous with Parcel 1 of the Hillsborough Jameson Property.

79.     Parcel 1 of the Hillsborough Jameson Property has been contaminated by hazardous waste and substances in the soils, surface water and ground water including, without limitation, Arsenic, Cadmium, Chromium, Iron and Lead released from the Facility, which has not been abated.

80.     Exposure to hazardous waste and substances such as Arsenic, Cadmium, Chromium, Iron and Lead are a substantial hazard to human health and the environment.

81.     Despite knowing that hazardous waste and hazardous substances, including Arsenic, Cadmium, Chromium, Iron and Lead, had migrated to the Parcel 1 of the Hillsborough Jameson Property, Mosaic failed to disclose this information to Jameson.

82.     As a result of this intentional failure to disclose the nature and extent of the contamination, Parcel 1 of the Hillsborough Jameson Property has been placed in further peril.

83.     Mosaic's operations and waste management practices for the hazardous waste, contamination, pollution and substances, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, and the resulting increased mineralization of other substances at the site, have been intentional, willful, wanton, or in reckless disregard.  Unfortunately, this is not the first instance whereby Mosaic's operations have resulted in the environmental contamination of the waters of Florida.  *See, e.g., Curd v. Mosaic Fertilizer, LLC,* 39 So. 3d 1216 (Fla. 2010).

84.     Mosaic has intentionally, willfully, wantonly, or recklessly, failed to inform Jameson that, due to Mosaic's environmental practices, hazardous waste, hazardous substances, and pollution have migrated off the site into the Mizelle Creek watershed, and onto Parcel 1 of the Hillsborough Jameson Property.

85.     Mosaic has at various times since publicly disclosing the contamination, intentionally, willfully, wantonly, or recklessly, misinformed the public, including Jameson, by asserting that hazardous chemicals and substances, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, migrating off the site had been properly evaluated and contained when, in fact, they have not.

86.     All conditions precedent to the maintenance of the causes of action set forth herein have occurred or have been waived.

## COUNT I
## COMMON LAW STRICT LIABILITY

87.     Jameson incorporates herein by reference the allegations set forth in paragraphs 1, 2 (c) and (d), 3-11, and 54-86 above as if fully set forth herein.

88.     Mosaic, as the owner and operator of the Facility, has engaged in abnormally dangerous, ultra-hazardous and unnatural activities by, without limitation, the manner in which it has used, stored, treated or disposed of hazardous waste about the Facility. In fact, Mosaic's use of, and activities at, the Facility are abnormally dangerous, ultra-hazardous and unnatural as a matter of law. *See Cities Service Co. v. State,* 312 So. 2d 799 (Fla. 2d DCA 1975).

89.     Mosaic's activities have resulted in the intentional, incidental or accidental release of hazardous substances into the soil and groundwater at the Facility, and on Parcel 1 of the Hillsborough Jameson Property.

90.     Further, Mosaic's activities, among other things, (a) have created a high degree of risk of harm to others, and particularly to Jameson, whose property has been impacted by the migrating contamination; (b) have created a likelihood that the resulting harm would be great; (c) have created a risk of harm that could not be eliminated by the exercise of reasonable care; (d) have not been matters of common usage; (e) have been inappropriate to the place where they have been carried on, and constitute a non-natural use of Mosaic's land which has imposed an unusual and extraordinary risk of harm to Parcel 1 of the Hillsborough Jameson Property, as well as to other properties in the vicinity; and (f) create or involve dangerous attributes which outweigh any value to the community.

91.     As a direct and proximate result of Mosaic's conduct in engaging in the abnormally dangerous and ultra-hazardous activities alleged above, hazardous wastes and other harmful hazardous substances used and stored at the site have continued to escape, leak and seep

on, under and around Parcel 1 of the Hillsborough Jameson Property. The harm sustained by Jameson is exactly the kind of harm posed by Mosaic's activities, the possibility of which made Mosaic's activities abnormally dangerous and ultra-hazardous, which harm includes, but is not limited to, loss of use of portions of the property for cattle leasing and conservation easements.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson compensatory, punitive, special, incidental, consequential damages, costs and such other relief and remedies permitted by law or equity.

## COUNT II
## NEGLIGENCE

92.     Jameson incorporates herein by reference the allegations set forth in paragraphs 1, 2 (c) and (d), 3-11, and 54-86 above as if fully set forth herein.

93.     Mosaic owed a duty of reasonable care to Jameson to ensure that hazardous substances and waste, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, were not released or discharged from the Facility onto Jameson's property, and into the groundwater thereunder.

94.     Mosaic breached this duty by, without limitation: (a) releasing or discharging hazardous waste and substances, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, from the Facility onto Jameson's property, and into the groundwater thereunder; (b) failing to adequately inform and warn Jameson that hazardous chemicals and substances had been released or discharged from the Facility onto Jameson's property, and into the groundwater thereunder; (c) failing to inform and warn Jameson of the extent of the release or discharge of hazardous waste and substances, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, from the Facility onto Jameson's property, and into the groundwater thereunder; (d) failing to inform and warn Jameson of the dangers posed by the release or discharge of

hazardous waste, pollutants and substances, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, from the site onto Jameson's property, and into the groundwater thereunder; and (e) using Jameson's property to qualify for permits and other benefits and privileges with state and federal agencies without authorization.

95.     As a direct and proximate result of these breaches of Mosaic's duties to Jameson, Jameson has suffered, and continues to suffer, injury and damage, which harm includes, but is not limited to, loss of use of portions of the property for cattle leasing and conservation easements.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson compensatory, punitive, special, incidental, consequential damages, costs and such other relief and remedies permitted by law or equity.

## COUNT III
## FLORIDA STATUTES § 376.313

96.     Jameson incorporates herein by reference the allegations set forth in paragraphs 1, 2 (c) and (d), 3-11, and 54-86 above as if fully set forth herein.

97.     Pursuant to *Florida Statutes* § 376.313, any person, including Jameson, may bring "a cause of action in a court of competent jurisdiction for all damages resulting from a discharge or other condition of pollution covered by §§ 376.30-376.317 and which was not authorized pursuant to chapter 403."

98.     Mosaic is a person within the meaning of *Florida Statutes* Chapters 376 and 403.

99.     Mosaic was and is the owner and operator of the Facility.

100.    Through Mosaic's operation of the Facility, Mosaic has:

a.      Released or caused the release and discharge of hazardous substances, chemicals, hazardous waste, pollution and substances, including but not limited to

Arsenic, Cadmium, Chromium, Iron and Lead, onto Parcel 1 of the Hillsborough Jameson Property, and the surface water, soils and groundwater thereunder; and

b.        Caused increased mineralization on and about Parcel 1 of the Hillsborough Jameson Property.

101.        These discharges and pollution are in violation of and covered by *Florida Statutes* §§ 376.30-376.317, and constitute prohibited discharges.

102.        These discharges and pollution are not authorized by *Florida Statutes* Ch. 403.

103.        Mosaic is and was the owner and operator of the Facility at the time of the creation of the pollutive condition caused by the releases and discharges of hazardous chemicals, hazardous waste, pollution and substances from the Facility and onto Parcel 1 of the Hillsborough Jameson Property or the surface water, soils and groundwater thereunder, and is responsible for the creation of this pollutive condition.

104.        The prohibited releases and discharges of hazardous chemicals, hazardous waste and substances, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, together with the increased mineralization, from the Facility onto Parcel 1 of the Hillsborough Jameson Property and the soils, ground water and surface water as well as the creation of the pollutive condition caused by the releases and discharges of the same have in fact occurred, and thus constitute an occurrence within the meaning of § 376.313, *Florida Statutes.*

106.        Jameson has suffered injury and damages resulting from these prohibited discharges of hazardous chemicals, hazardous waste, pollution and substances, which harm includes, but is not limited to, loss of use of portions of the property for cattle leasing and conservation easements.

105.     Mosaic and its agents and engineers knew at all times material that the Hillsborough Jameson Property was affected by the contamination revealed during the investigation and action plan following the EPA Consent Order and FDEP Consent Order, but Mosaic actively concealed the contamination from Jameson.

106.     Mosaic further concealed and misrepresented its ownership of the Hillsborough Jameson Property to the EPA and FDEP, resulting in further damage to Jameson and the inability of the authorities to notify Jameson in accordance with *Florida Statutes* § 376.30702.

107.     Jameson was within the class of record owners of real property required to receive notification under *Florida Statutes* § 376.30702.

108.     Jameson has suffered, and continues to suffer, injury and damages resulting from the contamination and Mosaic's failure to notify Jameson.

109.     Jameson retained the undersigned counsel to prosecute the claims asserted herein, and is obligated to pay the undersigned a reasonable fee for their services. Mosaic is responsible for payment of Jameson's reasonable attorneys' fees pursuant to *Florida Statutes* § 376.313.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson (a) compensatory, special, incidental, consequential damages, (b) an injunction (i) requiring Mosaic to immediately abate and remediate the pollution of Jameson's lands and the groundwater thereunder, and (ii) suspending the Facility operations until Mosaic fully complies with the required clean-up and remediation of Jameson's lands and the ground water thereunder, (c) attorneys' fees (d) costs, and (e) such other relief and remedies permitted by law or equity.

## COUNT IV
## TRESPASS

110.     Jameson incorporates herein by reference the allegations set forth in paragraphs 1, 2 (f), 3-11, 21, and 54-86 above as if fully set forth herein.

111.     Jameson is, and was at all times material, the fee simple owner of the Jameson Property, or possessed all attendant rights.

112.     The release and discharge of hazardous waste, hazardous chemicals, pollution and substances, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead from the Facility by Mosaic, and the increased mineralization has resulted in an actual and physical invasion of and interference with Parcel 1 of the Hillsborough Jameson Property, and the groundwater thereunder.

113.     This physical invasion and interference is continuing.

114.     Mosaic and its agents have improperly subjected Jameson's property to contamination, permits, regulation, and monitoring and have constructed monitoring wells and taken soil borings and continuously access Jameson's property for operational, monitoring and other purposes without authorization.

115.     This physical invasion and interference is continuing.

116.     Further, and without limitation, Mosaic has failed to fully complete and release all reclamation of the Hillsborough Jameson Property and Polk Jameson Property resulting in actual and physical invasion of and interference with the Jameson Property.

117.     This physical invasion and interference is continuing.

118.     This actual and physical invasion of and interference with the Jameson Property and the groundwater thereunder by Mosaic has been, and continues to be, without authority or consent.

119.     Mosaic's conduct is a trespass under Florida law for which Mosaic is legally responsible. The injuries caused thereby are substantial, tangible, continuing, and both temporary and permanent. The continuation of such conduct threatens irreparable harm to Jameson.

120.     Jameson has been damaged, and will continue to be damaged, by Mosaic's trespass on the Jameson Property, which harm includes, but is not limited to, loss of use of portions of the property for cattle leasing and conservation easements. Jameson also has suffered damages for which the usual measure of recovery for trespass is inadequate.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson compensatory, punitive, special, incidental, consequential damages, costs and such other relief and remedies permitted by law or equity.

**COUNT V**
**PRIVATE NUISANCE**

121.     Jameson incorporates herein by reference the allegations set forth in paragraphs 1, 2(c) and (d), 3-11, and 54-86 above as if fully set forth herein.

122.     The release and discharge of hazardous waste, hazardous substances and pollution including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, from the Facility by Mosaic, has resulted in an unreasonable invasion of, interference with, and impairment of Jameson's interest in the private use and enjoyment of Parcel 1 of the Hillsborough Jameson Property and the groundwater thereunder.  This invasion, interference and impairment is continuing.

123.     Further, as a result of this invasion, interference and impairment, Jameson has suffered the loss of use of its property and the groundwater thereunder.

124.     Mosaic's conduct thereby constitutes a private nuisance under Florida law for which Mosaic is legally responsible. The injuries caused thereby are substantial, tangible,

continuing, and both temporary and permanent, which harm includes, but is not limited to, loss of use of portions of the property for cattle leasing and conservation easements. The continuation of such conduct threatens irreparable harm to Jameson.

125.     By reason of this private nuisance, Jameson is entitled to damages, equitable relief, and all such other remedies as provided by law.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson (a) compensatory, punitive, special, incidental, consequential damages, (b) an injunction (i) requiring Mosaic to immediately abate and remediate the pollution of Jameson's lands and the groundwater thereunder, and (ii) suspending the Facility operations until Mosaic fully complies with the required clean-up and remediation of Jameson's lands and the ground water thereunder, (c) costs, and (d) such other relief and remedies permitted by law or equity.

## COUNT VI
## BREACH OF CONTRACT

126.     Jameson incorporates herein by reference the allegations set forth in paragraphs 1, 2(b), (c), and (d), 3-86 above as if fully set forth herein.

127.     Mosaic materially breached the Lease by, without limitation:

a.     Using the subject lands in a prohibitive manner, and committing violations of laws, rules and regulations;

b.     Exposing the lands to hazardous wastes;

c.     Subjecting the lands to permitting and regulatory action;

d.     Failing to fully surrender the subject lands; and

e.     Failing to properly reclaim the subject lands or restore the lands to a rentable usable condition, including failing to restore Parcel 1 of the Hillsborough

Jameson Property (as it has constructed large dikes and clay settling areas), failing to restore the Polk Jameson Property (as it has permitted the construction of gas and transmission lines on, under and across the Polk Jameson Property), and failing to restore the Hillsborough Jameson Property (as it has exposed Jameson to substantial environmental clean-up costs and must clean-up and remove the contamination on and among the Jameson Property).

128.    As a direct and proximate result of Mosaic's breach of the Lease, Jameson has suffered, and continues to suffer, damages, which harm includes, but is not limited to, loss of use of portions of the property for cattle leasing and conservation easements.

129.    Jameson retained the undersigned counsel to prosecute the claims asserted herein, and is obligated to pay the undersigned a reasonable fee for their services. Mosaic is responsible for payment of Jameson's reasonable attorneys' fees pursuant to ¶ 5.1 of the Lease.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson compensatory, special, incidental, consequential damages, attorneys' fees, costs and such other relief and remedies permitted by law or equity.

## COUNT VII
## CONTRACTUAL INDEMNIFICATION

130.    Jameson incorporates herein by reference the allegations set forth in paragraphs 1, 2(b), (c), and (d), 3-86 above as if fully set forth herein.

131.    Pursuant to ¶ 5.1 of the Lease, Mosaic agreed to keep and save the Lessor and all persons claiming by, through or under it harmless and indemnified from and against all liability, loss, cost, fines, penalties and damage of every kind and character, including court costs and attorneys' fees, to which it or they may be subjected by virtue of their ownership of or interest in

said lands, or by virtue of Lessee's use thereof or operations thereon, arising during the term of the Lease and for a period of one year thereafter.

132.     Mosaic further agreed that this was a continuing obligation, under which recoveries could be had during the Lease term or at any time thereafter.

133.     Jameson is the successor Lessor under the Lease.

134.     Jameson has been, and continues to be, damaged by Mosaic's use and operation of the lands, including, without limitation, the placement of hazardous waste, hazardous substances, pollution on portions of the lands and the grants of easements over the lands without any consent or approval from the Lessor, which harm includes, but is not limited to, loss of use of portions of the property for cattle leasing and conservation easements.

135.     Mosaic is obligated to indemnify and pay for all of Jameson's damages, penalties, costs, losses, fines and attorneys' fees pursuant to ¶ 5.1 of the Lease.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson compensatory, special, incidental, consequential damages, attorneys' fees, costs and such other relief and remedies permitted by law or equity.

## COUNT VIII
## SLANDER OF TITLE

136.     Jameson incorporates herein by reference the allegations set forth in paragraphs 1-53 above as if fully set forth herein.

137.     Mosaic slandered Jameson's title to the Hillsborough Jameson Property and the Polk Jameson Property by erroneously publishing the false Demand Letter, and otherwise disparaging Jameson's title to the Jameson Property.

138.     Jameson retained the undersigned to prosecute the claims asserted herein, and is obligated to pay them a reasonable fee for their services. Mosaic is responsible for payment of Jameson's reasonable attorneys' fees as part of Jameson's damages for slander of title.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson compensatory, punitive, special, incidental, consequential damages, attorneys' fees, costs and such other relief and remedies permitted by law or equity.

<u>COUNT IX</u>
<u>VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES</u>

139.     This is an action for relief under Florida's Deceptive and Unfair Trade Practices Act.

140.     Jameson incorporates herein by reference the allegations set forth in paragraphs 1-86 above as if fully set forth herein.

141.     As described herein, Mosaic's actions were willful and wanton, constituting intentional misconduct or gross negligence, and its acts constitute unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute §501.201 *et seq.*

142.     Jameson has a substantial likelihood of success stemming from a demonstrably clear legal right as Mosaic's acts have caused and will continue to cause irreparable injury and damage to Jameson for which it has no adequate remedy at law.

143.     As more particularly described hereinabove, Mosaic has on multiple occasions released, discharged, disposed of, treated or stored hazardous waste and substances, including but not limited to Arsenic, Cadmium, Chromium, Iron and Lead, from the Facility onto Jameson's property, and into the groundwater thereunder.

144. Mosaic thereby repeatedly disposed of, treated or stored hazardous waste: (a) at a place other than a hazardous waste facility which has a current and valid permit; or (b) in knowing violation of material conditions or requirements of applicable permits, rules or standards, which violations had substantial likelihood of endangering human health, animal or plant life or property.

145. Additionally, Mosaic repeatedly used Jameson's property to qualify for permits and other benefits and privileges with state and federal agencies without authorization, and consistently and continuously certified, under oath, to the EPA and FDEP and other agencies and persons that Mosaic owns all property within a mile of the Facility.

146. In reality, though:

    a. Mosaic did not own the lands within a mile of the Facility;

    b. Mosaic did not control the lands within a mile of the Facility; and

    c. Mosaic did not seek permission or have access to the Jameson Property within a mile of the Facility.

147. In doing so, Mosaic made false statements or representations, or knowingly omitted material information, in hazardous waste applications, reports, permits or other documents required by applicable law.

148. Mosaic engaged in the referenced actions to acquire or maintain, directly or indirectly, an interest in or control of portions of the Jameson Property, including the portion located within one mile of the Facility. Indeed, in furtherance of this activity, Mosaic actually represented to state and federal agencies that Mosaic does own or control the subject property.

149.    Jameson retained the undersigned counsel to prosecute the claims asserted herein, and is obligated to pay the undersigned a reasonable fee for their services. Mosaic is responsible for payment of Jameson's reasonable attorneys' fees pursuant to §501.2105, Florida Statutes.

WHEREFORE, Jameson respectfully requests that the Court enter judgment against Mosaic awarding Jameson (a) compensatory, special, incidental, consequential damages, (b) an injunction (i) requiring Mosaic to immediately abate and remediate the pollution of Jameson's lands and the groundwater thereunder, and (ii) suspending the Facility operations until Mosaic fully complies with the required clean-up and remediation of Jameson's lands and the ground water thereunder, (c) attorneys' fees (d) costs, and (e) such other relief and remedies permitted by law or equity.

## JURY TRIAL DEMAND

Jameson hereby demands a jury trial on all issues so triable.

/s/ Jonathan B. Sbar
Robert L. Rocke, Esq. (FBN 710342)
Email:  rrocke@rmslegal.com
Jonathan B. Sbar, Esq. (FBN 131016)
Email:  jsbar@rmslegal.com
Raul Valles, Esq. (FBN 148105)
Email:  rvalles@rmslegal.com
ROCKE, McLEAN & SBAR, P.A.
2309 S. MacDill Avenue
Tampa, FL  33629
Phone:  813-769-5600
Fax:      813-769-5601
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic mail using the Court's CM/ECF system on July 7, 2015, to:

David B. Weinstein, Esq. (FBN 604410)
Jonathan S. Tannen, Esq. (FBN 70842)
GREENBERG TRAURIG, P.A.
625 E. Twiggs Street, Suite 100
Tampa, FL 33602
Phone: 813-318-5700
Fax:     813-318-5900
Primary email:  weinsteind@gtlaw.com
Primary email:  tannenj@gtlaw.com
Secondary email:  dunnla@gtlaw.com; FLService@gtlaw.com
Attorneys for Defendant, Mosaic Fertilizer, LLC

I. William Spivey, II, Esq. (FBN 0701076)
GREENBERG TRAURIG, P.A.
450 S. Orange Avenue, Suite 650
Orlando, FL 32801
Phone: 407-420-1000
Fax:     407-420-5909
Primary email:  spiveyw@gtlaw.com
Attorneys for Defendant, Mosaic Fertilizer, LLC


/s/ Jonathan B. Sbar
Attorney