# EXHIBIT 1

**Page 1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMESON LAND COMPANY, LLC,
        Plaintiff,
vs.            CASE NO: 8:15-CV-00409-JDW-EAJ
MOSAIC FERTILIZER, LLC,
        Defendant.

_____

DEPOSITION OF EDWARD T. WOLPERT, Ph.D.
CORPORATE REPRESENTATIVE OF
RAFFA CONSULTING ECONOMISTS, INC.

_____

DATE:        Wednesday, July 13, 2016
PURSUANT TO:    Notice by Counsel for
        Plaintiff

TIME:        Commencing at 9:58 a.m.
        Concluding at 11:17 a.m.
LOCATION:    Greenberg Traurig, P.A.
        450 South Orange Avenue
        Suite 650
        Orlando, Florida

REPORTED BY:    Juanita Annette Butler
        Stenographic Court Reporter
        Notary Public, State of Florida
        Commission No. FF 944824
        Expires: December 21, 2019

**Page 2**

A P P E A R A N C E S :
ROBERT L. ROCKE, ESQUIRE
RRocke@RMSLegal.com
ROCKE MCLEAN SBAR, P.A.
2309 SOUTH MACDILL AVENUE
TAMPA, FLORIDA 33629
    Counsel for Plaintiff

I. WILLIAM SPIVEY, II, ESQUIRE
SpiveyW@GTLaw.com
GREENBERG TRAURIG, P.A.
450 SOUTH ORANGE AVENUE
SUITE 650
ORLANDO, FLORIDA 32801

    Counsel for Defendant

EXAMINATION INDEX
EDWARD T. WOLPERT, PH.D.        PAGE
DIRECT BY MR. ROCKE        4
CROSS BY MR. SPIVEY        47
STIPULATION        48
CERTIFICATE OF OATH        49
CERTIFICATE OF REPORTER        50
ERRATA SHEET        51
WITNESS' SIGNATURE        52
READ AND SIGN LETTER TO WITNESS        53

**Page 3**

EXHIBIT INDEX
        PAGE
157  CURRICULUM VITAE:        5
     EDWARD T. WOLPERT, PH.D.

158  ENGAGEMENT LETTER TO MR. SPIVEY        7
     FROM RAFFA CONSULTING ECONOMISTS
     DATED JAN 14, 2016

159  PRELIMINARY RULE 26 DISCLOSURE OF        16
     DR. EDWARD T. WOLPERT - JUN 1, 2016

160  PRELIMINARY REBUTTAL RULE 26        45
     DISCLOSURE OF DR. EDWARD T. WOLPERT

161  COMPOSITE: REMAINDER OF MATERIALS        45
     PRODUCED AT DEPOSITION

**Page 4**

1          P R O C E E D I N G
2        THE COURT REPORTER:  Do you solemnly
3    swear or affirm that the testimony you are
4    about to give in this case will be the whole
5    truth and nothing but the truth?
6        THE WITNESS:  I do.
7        THE COURT REPORTER:  The witness has been
8    sworn.
9          EDWARD T. WOLPERT, PH.D.,
10    the witness herein, being first duly sworn under
11    oath, was examined and testified as follows:
12        DIRECT EXAMINATION
13    BY MR. ROCKE:
14        Q.  Good morning, Dr. Wolpert.  I introduced
15    myself, Bob Rocke.  I represent Jameson Land Company
16    in this lawsuit.
17        We had asked you to bring some materials
18    with you.  Have you brought those materials?
19        A.  Yes.
20        Q.  Okay.  Before I get into all this, I'm
21    going to take a quick look.  I'm going to spend a
22    little bit of time walking through those materials
23    with you.  But before we actually begin that
24    process, could I take a look at your file?
25        A.  Sure.

1  Q. The materials that you've delivered to us
2 this morning, Dr. Wolpert, are these the totality of
3 documents related to your engagement by Mosaic in
4 the Jameson lawsuit?
5  A. They are, with the caveat of the emails
6 which Mosaic counsel has claimed privilege on. The
7 remainder are included.
8  Q. So if a privilege has not been claimed, the
9 materials that you've delivered to us today
10 represent the totality of your file?
11  A. Yes.
12  Q. All right. Thanks.
13  And what is the material here?
14  A. Those are printouts that were mentioned in
15 my June 1st report from the Hillsborough County and
16 Polk County websites.
17  Q. Property Appraiser websites?
18  A. Yes, sir.
19  Q. Do you mind if I go ahead and just mark the
20 originals and we will give you copies when we're
21 done?
22  A. Certainly.
23  Q. Let me hand you what we're going to mark as
24 Exhibit 157.
25

1  (Whereupon, Exhibit Number 157 was
2  marked for identification.)
3 BY MR. ROCKE:
4  Q. What is that document?
5  A. This is a current copy of my curriculum
6 vitae.
7  Q. Have you ever been engaged as a damages
8 expert by or on behalf of Mosaic before this case?
9  A. No.
10  Q. What about the Greenberg Traurig law firm?
11  A. Not that I recall.
12  Q. Is this the first time you've worked with
13 Mr. Spivey and Mr. Weinstein?
14  A. Yes.
15  Q. And who initially contacted you in
16 connection with this engagement?
17  A. I believe Mr. Spivey contacted our office
18 but I don't know the chronology of how that contact
19 took place.
20  Q. Was the contact to engage you specifically
21 or just someone at Raffa Consulting?
22  A. I don't know.
23  Q. Do you know approximately when you first
24 spoke with a representative from Mosaic regarding
25 your engagement?

1  A. It was in approximately January of this
2 year. It was near the time of the engagement
3 letter, which was sent out on January 14th of 2016.
4  Q. Let's go ahead and mark the engagement
5 letter as 158.
6  (Exhibit Number 158 was marked for
7  identification.)
8 BY MR. ROCKE:
9  Q. And the engagement letter is addressed to
10 Mr. Spivey, correct?
11  A. Yes.
12  Q. Is it your recollection that you discussed
13 the engagement with Mr. Spivey before you generated
14 this engagement letter?
15  A. Yes and no. I don't think I spoke about
16 the engagement letter but we did speak about the
17 case and what he was interested in engaging us to
18 do.
19  Q. What did you understand the purpose of your
20 engagement was in this matter?
21  A. To assist in damages as needed.
22  Q. And was the engagement any more specific
23 than assist in damages?
24  A. No.
25  Q. In your experience -- and you've been doing

1 this for many years, haven't you, testifying as a
2 damages expert?
3  A. Yes, sir.
4  Q. Do you typically formulate opinions with
5 regard to damages that a party would be entitled for
6 whatever loss that party is complaining about in the
7 lawsuit?
8  A. Would I typically be engaged -- I'm sorry,
9 I don't follow what you're asking.
10  Q. My question is: Do you, in your capacity
11 as an expert in damages, typically work on
12 formulating what the damages are for a particular
13 case?
14  A. Yes.
15  Q. And in your experience, you believe that
16 there are certain damages that you are qualified to
17 offer opinions on based upon your training,
18 education and experience?
19  A. There are.
20  Q. And the converse of that, you believe that
21 there are circumstances that you're not qualified to
22 offer damages expert testimony?
23  A. Well, I don't think I'm the authority on
24 whether I'm qualified or not. I think that is for
25 the court to determine, certainly. But as far as

1  damages, the word "damages," I notice was used by
2  the real estate appraiser for instance as a
3  differential between two numbers. I don't have any
4  background or expertise in rendering opinions about
5  a real property, opinion of, quote/unquote, damages.
6      So I'm trying to answer, as best I can,
7  your question. I would not, in that instance, have
8  expertise in determining the difference between two
9  real property numbers. But in other regards, I
10  certainly have a lot of experience in calculating
11  damage numbers.
12     Q. In this particular engagement, were you
13  asked to formulate what the damages may be in this
14  case?
15     A. Not specifically, no. Again, engagement
16  was to assist with damages. I have received and
17  reviewed several iterations of alleged damages by
18  the plaintiff starting with a Presuit Demand Letter
19  up through answers to interrogatories. So at this
20  point, it's unclear to me what the ultimate
21  allegation of damages actually are. And, therefore,
22  I'd say it's a work in progress upon what my
23  response to that would be.
24     Q. And you talked about, specifically, a
25  damage analysis that was done by an appraiser.

1  That's something that you considered in connection
2  with your engagement?
3     A. Yes.
4     Q. Would you agree that you were not qualified
5  to offer an opinion with regard to what an appraiser
6  would do in evaluating property -- real property?
7     A. Real property, that's correct. He arrived
8  at an opinion of value of real property based on a
9  set of assumptions. I don't have the expertise or
10  an opinion on that at all, no.
11     Q. And is it your understanding that under
12  Florida law there's actually certain licensure
13  requirements for an appraiser to act in that
14  capacity?
15     A. That's my understanding, sure.
16     Q. And in reviewing your CV, you're not
17  licensed to render an opinion with regard to the
18  value of real property, correct?
19     A. No, I'm not.
20     Q. Now, are you familiar with the
21  methodologies that is required by the Appraisal
22  Institute for licensed appraisers to perform
23  appraisals of real property?
24     A. Generally, I am, yes.
25     Q. Have you ever rendered an opinion as to

1  whether or not an MAI, licensed in the State of
2  Florida, has met the requirements of and followed
3  the procedures mandated in the Institute?
4     A. No.
5     Q. Is that something you're qualified to do?
6     A. Again, I don't think I'm the authority of
7  if whether I'm qualified or not qualified. I
8  wouldn't think I am. I don't have a background in
9  it, no.
10     Q. And, in this case, you're not offering an
11  opinion with regard to whether or not the
12  procedures, processes and methods that Chad Durrance
13  used in evaluating the property were correct or
14  incorrect; is that accurate?
15     A. Absolutely, yes. I state it in my report
16  as well.
17     Q. You have been qualified as an expert
18  witness testifying in federal courts, correct?
19     A. Yes.
20     Q. Have there ever been occasions where you're
21  engaged as an expert but the court had prohibited
22  you from testifying or rendering an opinion?
23     A. Not that I'm aware of, no.
24     Q. Are you familiar with the concept of
25  Daubert challenges?

1     A. Yes.
2     Q. With regard to any opinions that you've
3  every rendered, has a party prevailed on a Daubert
4  challenge to an opinion that you rendered?
5     A. Again, not that I'm aware of, no.
6     Q. The other report that you had mentioned, in
7  your preliminary report in this case and the
8  rebuttal report, was Michael Gurr. Do you recall
9  that?
10     A. Yes, sir.
11     Q. And do you know what Mr. Gurr's
12  professional training is?
13     A. Not specifically. His report was an
14  environmental report regarding groundwater
15  contamination sources, remediation expenses and the
16  like. I don't have an opinion about his background
17  or if he is qualified to render such an opinion or
18  not.
19     Q. You were actually provided a copy of his
20  curriculum vitae as well, correct?
21     A. I believe it's actually part of the Rule 26
22  you identified as one of the documents but take a
23  look.
24     I don't see it in here but I don't have no
25  reason to dispute it wasn't provided. It's

1 possible, just to save a couple pages of paper, I
2 didn't print it.
3 Q. Understood. Are you aware that Michael
4 Gurr is a professional licensed engineer in the
5 State of Florida?
6 A. I'm not aware one way or the other. I have
7 no reason to dispute it though.
8 Q. Do you believe that you're qualified to
9 render an opinions with regard to engineering
10 issues?
11 A. Again, I don't think it's for me to
12 determine. I don't think so. I don't have a
13 background, or an education, or work experience in
14 that.
15 Q. And, obviously, you're not licensed as a
16 professional engineer in Florida, correct?
17 A. I am not.
18 Q. After your initial engagement in this case,
19 was there a more precise purpose that you understood
20 for your engagement?
21 A. No.
22 Q. So when you said that you were hired to
23 assist in damages, that's your assignment as you sit
24 here today?
25 A. It is, yes.

1 Q. In your experience, Dr. Wolpert, have you
2 ever, in prior cases, been hired to evaluate the
3 opinions of other experts?
4 A. Yes.
5 Q. Is that in essence what you've done here?
6 A. In essence. The reason I'm hesitant on my
7 role evolving from when it was presented back in
8 January is, as articulated in my opinions, there
9 appears to be a range of damages being alleged. And
10 I'm not, as I sit here this morning, clear on what
11 the ultimate allegation of damages are.
12 And, as a result, as far as responding to
13 it or not responding to it, or, as my role evolved,
14 it's difficult for me to say until I know exactly
15 the dollar amount, the predicate and the reasons
16 that those damages are being argued and alleged by
17 the plaintiff. That is somewhat unusual for my role
18 of responding to another expert in the realm of
19 damages.
20 Q. And why, in your experience, is that
21 unusual?
22 A. Well, for most instances where I'm hired or
23 our firm is hired to do rebuttal work or to review
24 another expert, there's something to actually rebut.
25 There is a report that has a predicate with data

1 that shows the sources. It shows a progression of
2 calculations that I can assess. But in this case,
3 in most instances, I have not seen that.
4 Q. Is part of your engagement in this matter
5 to evaluate the factual predicate for the expert's
6 conclusions?
7 A. Not necessarily. I would -- again, in my
8 estimation -- consider that something under either
9 the liability or the causation components of the
10 lawsuit. It wouldn't be for me to determine.
11 However, those documents allow, from a damages
12 perspective, quite often they offer me the ability
13 to review where they've come from; are they
14 accurate; have those assumptions been relayed
15 accurately into the damage calculation and so forth.
16 But without that underlying predicate, I can't do
17 any of those things.
18 Q. And is it your position in this case you
19 can't do that because the factual predicate doesn't
20 exist?
21 A. Well, again, I've articulated in my two
22 reports the shortcomings that I observed from an
23 analytic standpoint, that being one of them, for
24 sure.
25 Q. Let me ask you, before I move on, the CV

1 that we have marked as Exhibit 157, is that the
2 latest complete curriculum vitae that you have?
3 A. Yes.
4 (Exhibit Number 159 was marked for
5 identification.)
6 BY MR. ROCKE:
7 Q. Let me hand you Exhibit 159.
8 A. Thank you.
9 Q. For the record, what is 159?
10 A. This is a copy of my June 1, 2016
11 Preliminary Rule 26 Disclosure in this matter.
12 Q. The second page identifies various
13 materials that you've reviewed in connection with
14 your engagement. Do you see that?
15 A. Yes, sir.
16 Q. Who decided what materials you would
17 review?
18 A. I would say that's a compilation of myself
19 and plaintiff's counsel.
20 Q. Did you actually have a list that you
21 provided of materials that you believed were
22 necessary to perform the jobs you were hired to do
23 in this case?
24 A. No.
25 Q. Did you rely on all the materials that you

1  reviewed in formulating your opinion?
2     A. Yes.
3     Q. Is there any document that you've
4  identified in Paragraph 2 of your report that you
5  didn't rely on?
6     A. The word "rely" is, again, open to
7  interpretation. I received each one and reviewed
8  each document and, therefore, I've relied upon them.
9  Whether they were relied upon explicitly or just
10 simply as background in the matter, that's as best I
11 can answer. Some were relied upon more explicitly
12 than others, certainly.
13    Q. Let me see if I can approach it this way,
14 in reaching the conclusions that you articulated in
15 your preliminary report, which is Exhibit 159, are
16 there specific items contained in Paragraph 2 of
17 your report that you relied upon in reaching those
18 conclusions?
19    A. Yes.
20    Q. It's probably best if you could just go
21 through quickly as you look through this -- and the
22 reason I ask you that, Dr. Wolpert, I'm not going to
23 devote a lot of time to matters that you didn't rely
24 on.
25    A. Understood.

1     Q. Obviously, a Retainer Agreement is an
2  example of a document that you didn't rely on. So
3  if you would just identify those specific documents
4  you relied upon, then we can go through them.
5     A. Sure. The Plaintiff's Rule 26 Disclosure,
6  the Amended Complaint. Pages 26 through 31 of the
7  Plaintiff's Presuit Damage Package, which is also
8  somewhat replicated in -- if you skip down below
9  Retainer Agreement, we received the whole Demand
10 Package.
11    The Plaintiff's Notice of Serving Verified
12 Answers to First Set of Interrogatories. The
13 October 24, 2011 email from Mr. Harden to
14 Mr. Gremley.
15    The April 4, 2014 letter from Greenberg to
16 Mr. Harper. The Tax Return Line Item. The
17 Financial Statement, Line Item.
18    The April 22, 2016 email from Mr. Valles to
19 Mr. Spivey. The combined Closing Statement and
20 related information from the bank. The Platinum
21 Bank email, February 4, 2015.
22    I think the last line item is a --
23    Q. A duplication?
24    A. Yeah. I think it's a typo. I don't think
25 there is a second letter.

1     The case law mentioned at the top of
2  page 4, all four of those cases. The Defendant's
3  Notice of Intent to Serve Subpoena on Mr. Hall and
4  Robbins Manufacturing. The email from Mr. Hall of
5  Robbins Manufacturing. The correspondence.
6     Q. Are you referring to the correspondence
7  from Land South to Mr. Gremley?
8     A. Yes. I wanted to find it first before I
9  said how explicitly it was relied upon.
10    Yes. We can talk about it. Again, it was
11 certainly background and certainly something I
12 reviewed. I'm not sure ultimately how much I
13 explicitly relied upon it.
14    The Sale and Purchase Agreement between
15 Jameson and Seller. The Expert Report of Stanley
16 Reed.
17    And, again, the additional materials and
18 sources was my efforts to go online to conceptualize
19 the property. I looked around at those property
20 appraiser websites and Google maps to see where it
21 was; how far the properties were from each other,
22 simply as background but I did explicitly rely on
23 those.
24    Q. Did not?
25    A. I did.

1     Q. You did?
2     A. Again, just for my own benefit.
3     Q. Among those documents that you just
4  identified that you relied upon in formulating your
5  opinion in this case, did you specifically ask for
6  any of those documents?
7     A. Specifically, I can't recall. I have had
8  conversations with Mr. Spivey more on a general or
9  global level as far as receiving information that
10 would serve as a predicate for the numbers being --
11 the damage numbers being prepared by the plaintiff.
12    Q. And when you indicated that you were trying
13 to get information that served as a predicate for
14 the damages number, what do you mean by that?
15    A. Well, for instance, if you tell me that
16 you've been damaged by $100. And I don't have an
17 understanding from the way that that damage number
18 has been presented, what's the source? Where did it
19 come from? Are there emails? Are there documents?
20 Are there bank account records?
21    Without having an understanding of how that
22 -- what's the factual predicate for that $100, it's
23 difficult for me to respond as an economist or
24 damage expert. So when I say a general request to
25 Mosaic counsel, it's in line with that analogy.

1    I've received a Presuit Demand, a Rule 26
2  Disclosure. There's a lot of numbers that have been
3  alleged in the way of damages by the plaintiff in
4  this case, so my response to that is, what's the
5  basis of that, so I can analyze that. Where did
6  that come from? Are there emails? Are there
7  documents? Are there records. Where do you go as
8  far as getting to the bottom of what is the
9  underlain factual predicate for those numbers.
10    Q. So part of your purpose in being hired was
11  to evaluate whether there was evidence to support
12  the damages that were being sought by my client?
13    A. Well, again, that gets into, from what I
14  understand, to be more of a legal determination.
15  I'm certainly not the judge on whether the plaintiff
16  has established a factual predicate for any of this.
17  All I'm trying to do is -- from a rebuttal or
18  response perspective, I need to know where those
19  numbers came from in order to respond.
20    Q. And do you believe, based upon the
21  evaluation of the materials that you've described
22  for us, that you've been able to do that?
23    A. No.
24    Q. You have no opinion regarding the fair
25  market value of the eight pieces of real property at

1  issue in this lawsuit, do you?
2    A. No.
3    Q. You don't have an opinion as to the impact
4  of the ongoing reclamation on any of the eight
5  parcels that are the subject of this lawsuit?
6    A. No.
7    Q. Are you aware that Mosaic has hired
8  professional engineers to evaluate the reclamation
9  and contamination claims in this lawsuit?
10    A. Not specifically, I'm not, no.
11    Q. I know you testified earlier that that's
12  not your area of expertise, correct?
13    A. Correct.
14    Q. Would it assist you in having that
15  information in order to determine whether the
16  factual predicates that Mr. Gurr has relied upon are
17  consistent with Mosaic's own experts?
18    A. That's a good question. If I had those
19  documents from a Mosaic expert -- I think, again,
20  from a damage perspective, it would just simply
21  permit a compare and contrast to what Mr. Gurr has
22  done.
23    Beyond that, I don't have an opinion on the
24  environmental aspects of it. So I wouldn't know if
25  Mr. Gurr's number is correct or Mosaic's number is

1  correct but it would certainly add texture to what
2  Mr. Gurr has done.
3    Q. I apologize I think you may have answered
4  this. Were you aware that such experts have
5  evaluated the reclamation and contamination issues
6  in this case on behalf of Mosaic?
7    A. I haven't seen those reports. I'm not
8  aware of specific studies that have been done,
9  experts that have been hired, no.
10    Q. You've identified, in the materials you've
11  relied upon, a report from Stanley Reed?
12    A. Yes.
13    Q. Is that something you asked for?
14    A. Not specifically. Again, I guess I'm
15  having concern with how it's relayed on what I asked
16  for or not. I know that there was, from my
17  understanding as we were working through this case
18  in the spring, there was an appraisal that was
19  performed by the bank on one of the pieces of
20  property. Mosaic counsel indicated that they had a
21  real property appraiser working on appraisals. I
22  certainly wanted to see it. But whether I asked
23  them to have the report done or not, I didn't.
24    So when I was told that it was in the
25  works, it's certainly something I asked for and was

1  interested in.
2    Q. As part of your engagement in this case,
3  did you evaluate the work product of Mr. Reed?
4    A. I just reviewed his report. I did not look
5  at conclusions. Just like Mr. Durrance, I don't
6  have the background to go through it more so than
7  just the conclusions that they reached based upon
8  the assumptions that they relied upon.
9    Q. And if I understand your testimony, you
10  didn't evaluate the methodology that Mr. Reed
11  utilized in reaching his conclusions; is that
12  correct?
13    A. Only insofar -- like I did with
14  Mr. Durrance -- to take note of what assumptions and
15  what methodology he used. But, again, to assess
16  whether that was a correct methodology or an
17  incorrect, no.
18    Q. And that would apply to both Mr. Reed and
19  Mr. Durrance?
20    A. That's right.
21    Now, how those numbers apply to damages,
22  that's what was of consequence to me.
23    Q. But not how they reached their conclusions?
24    A. That's correct.
25    Q. And then just to cut through it -- and I

1  won't belabor the point. You're not offering an
2  opinion regarding the methodologies used by either
3  Mr. Durrance or Mr. Gurr in reaching their
4  conclusions; is that accurate?
5      A. Again, I just don't want to get caught up
6  in an incorrect response. For instance, as I noted
7  in my June 21st report, I noticed that Mr. Durrance
8  used March of 2016 for his two numbers, his
9  comparative analysis numbers. I have an opinion
10  about that.
11      Now, whether that falls under the umbrella
12  of methodology, I don't think so. But just to be
13  clear on the record, I have more of a concern with
14  the use of that date than that he used the market
15  approach or the income approach or the cost approach
16  or how did he reach those conclusions. I'm not
17  worried about that part of it. I'm worried about the
18  potential application of his conclusions based
19  on a fair market value of March 2016.
20      Q. Do you have an understanding as to whether
21  the date for valuation from an appraiser's
22  standpoint is a significant factor in the
23  methodology that that appraiser uses in reaching the
24  conclusions that they reach?
25      A. I would imagine it would. I do business

1  valuation and it is very important what date you
2  use, certainly.
3      Q. And are you aware of any facts that suggest
4  that by using the dates that Mr. Durrance used in
5  reaching the conclusions that he reached in his
6  report -- are inconsistent with the guidelines of
7  conducting appraisals of real property in the State
8  of Florida?
9      A. Not at all. I'm not suggesting that his
10  numbers from March of 2016 are valid or invalid.
11  I'm saying where they fit into an assessment of
12  damages or potential damages in this matter, that's
13  what I would take issue with.
14      Now, if he measured it in March of 2015 or
15  March of 2017, it doesn't matter in that regard.
16  It's how the use of that information or the
17  potential use of that information was -- where it
18  goes back into damages -- what I would have an
19  opinion about.
20      Q. Did you evaluate the date that Mr. Reed
21  used in formulating his opinion as to value?
22      A. Did I evaluate it? I did not evaluate it.
23      There was no evaluation of it. He lists in
24  his report, in my opinion, the market value of the
25  described property as of this date, so his was a

1  current appraisal.
2      Q. You don't have any issues in regard to his
3  conclusions based upon that date?
4      A. No.
5      Q. And that's the date of the report, correct?
6      A. Yes.
7      Q. Which is, for the record?
8      A. June 1st, I believe.
9      Yes.
10      Q. Of 2016?
11      A. 2016, correct.
12      Q. Your initial report describes it as a
13  preliminary report. Why is that?
14      A. Just to be clear, the opinions are final as
15  of when they were written. But it's always subject
16  to supplementation based on receipt of additional
17  information. As described in the report, there was
18  a lot of information that I hadn't received or
19  reviewed. If that report is provided to me next
20  week or next month, then I certainly reserve the
21  right to supplement or update my opinion.
22      Q. When do you believe you reached your final
23  conclusions?
24      A. Well -- and I understand it's a moving
25  target. So we don't have to go back and do another

1  deposition at some point -- I don't anticipate doing
2  additional work, is the answer. If additional
3  information is provided and I'm asked to review it,
4  I certainly will.
5      Q. And just to tie the loop up here, June 1st,
6  2016, you've reached your final conclusions with the
7  proviso that unless you get additional information
8  that may impact your final conclusions?
9      A. Well -- and that's what happened. I
10  received the environmental report from Mr. Gurr and
11  the Durrance appraisals subsequent to June 1st and
12  that necessitated the June 21st report that was
13  provided.
14      If a similar scenario takes place at some
15  point in the future and I'm asked to do the same
16  thing, I would.
17      Q. So as of the date of your Preliminary
18  Rebuttal Report of June 21, 2016, that represents
19  your final conclusions based on the information that
20  you had available to you?
21      A. Yes. Again, to be clear, as indicated on
22  June 21st, all of these June 1st opinions are still
23  valid. The June 21st report does not replace the
24  June 1st report. This is simply an addendum or
25  supplement based upon the receipt of these

1 additional documents.
2     Q. Let's talk about that a moment -- and I'll
3 give you your report so you can look at it.
4     In your experience, have you prepared
5 rebuttal reports in prior engagements?
6     A. Yes.
7     Q. And what do you understand the purpose of a
8 rebuttal report is?
9     A. It's to address either the opinions or the
10 damage assessment of the other party.
11     Q. And the reason I ask you that question,
12 Dr. Wolpert, you had mentioned the Preliminary
13 Rebuttal Report, dated June 21, 2016, adds or
14 supplements to your June 1st report?
15     A. Right.
16     Q. Is it your testimony that the conclusions
17 contained in your June 21st rebuttal report didn't
18 change the conclusions that you've reached in your
19 initial report, June 1, 2016?
20     A. I would characterize it as a supplement
21 rather than a change. They address the additional
22 data that was received.
23     And, again, to go back to what I mentioned
24 a little while ago, I'm not clear based upon the
25 Presuit Demand, the answers to interrogatories, the

1 various numbers that have been alleged by the
2 plaintiff, I'm not ultimately sure what their number
3 is? What their damages are?
4     And until I know that, all I can do is keep
5 covering the material I received. And that's what
6 I've done by looking at Mr. Gurr's report and the
7 Durrance appraisals.
8     Q. Have you reached an opinion as to whether
9 or not the plaintiff sustained any damages in this
10 case?
11     A. No.
12     Q. You haven't reached that opinion?
13     A. I have not.
14     Q. So you don't know one way or the other
15 based upon the materials that you've reviewed
16 whether they've been damaged or not as a result of
17 the claims articulated in the Amended Complaint?
18     A. I have not.
19     Again, to me, there's a liability
20 component, there's a causality component and then
21 there's a damage component. I certainly don't have
22 an opinion as to whether Mosaic is liable for
23 anything if they did anything wrong.
24     Secondarily, if there was something that
25 was done wrong, did it actually cause damage.

1 That's an important distinction.
2     And third, if there was damage, how much
3 was it? That third is what my focus is. How much
4 damage there might have been.
5     I don't see evidence in what I've received
6 that there was damage. There may have been but I
7 haven't seen evidence of it, as I sit here.
8     Q. And you would agree that to reach that
9 conclusion you just stated, you had to evaluate the
10 evidence?
11     A. I've examined everything I've received and
12 I don't see -- I don't see the evidence that a
13 damage exists.
14     Q. Is that your opinion that they haven't been
15 damaged?
16     A. No. As I said a moment ago, I don't have
17 an opinion on whether they have been damaged or not.
18 Liability or causation, I do not have opinions about
19 that. When it comes to quantifying an amount and
20 saying what the damage amount is, I don't have a
21 conclusion that it's zero or something other than
22 zero.
23     Q. Are you aware if Mosaic's engineer, hired
24 to provide expert opinion in this case, has reached
25 a conclusion as to the restoration cost necessitated

1 by the claims made in the Amended Complaint?
2     A. No, I'm not aware one way or the other.
3     Q. The various cases that you've identified in
4 your initial report, did you review those cases and
5 evaluate the conclusions contained in those cases in
6 reaching the conclusions that you have articulated
7 in both your preliminary -- Initial Rule 26
8 Disclosure and Preliminary Rebuttal Disclosure?
9     A. I reviewed those cases. I don't think I --
10 I'm not a legal expert. I couldn't evaluate them,
11 as you say, but I certainly reviewed them.
12     Q. What impact did they have on the
13 conclusions you reached?
14     A. They underlie my preconceived notion of the
15 Economic Waste Doctrine. They talk about -- again,
16 a legal limit to a potential remediation or value on
17 a property.
18     Q. Is it your understanding that Mosaic has
19 hired someone to evaluate the restorative cost as it
20 would apply in an economic waste context?
21     A. I'm not aware one way or the other.
22     Q. Do you know if there is any evidence that
23 the diminution in value of the subject property is
24 greater or less than the restoration cost?
25     A. All I can do is speak to the evidence I've

1  received. And Mr. Gurr is of the opinion that the
2  restoration cost is upwards of $22.5 million. It
3  appears the property was purchased for $1 million.
4  All of the appraisals are far less than $22 million.
5      So based on those documents, it appears
6  that the assessment by Mr. Gurr is -- of what it
7  would take to restore the property is in excess of
8  the value of the property.
9      Q. Is it your understanding that the cases
10 that were provided to you regarding the Economic
11 Waste Doctrine addressed that very issue?
12     A. That's my recollection. It's been a little
13 while since I reviewed them but I can certainly pull
14 them out.
15     Q. And as you're looking for that,
16 Dr. Wolpert, whose idea was it to provide you with
17 the Presuit Demand package?
18     A. Whose idea was it?
19     Q. Yes.
20     A. I don't know. It wasn't my idea.
21     Q. What impact did the Presuit Demand package
22 have in the conclusions that you reached?
23     A. Again, as previously stated, they were
24 alleged losses by the plaintiff in the way of
25 damages. So as the damages expert hired by defense

1  counsel, I certainly see it's reasonable for me to
2  know that that's been alleged and that's out there.
3      As I tried to articulate in my June 1st
4  report, there's a chronology or an evolution, I
5  guess, of damages from that Presuit Demand. Yet,
6  the chronology doesn't seem to distance itself from
7  the previous iterations. Meaning, I don't see in
8  their Rule 26 Disclosure or their answers to
9  interrogatory (sic) that their Presuit Demand is not
10 valid anymore.
11     So my answer is, you know, that, as I sit
12 here, I don't know if Jameson will sit in court and
13 say they've been damaged by $1.8 billion. I haven't
14 seen any evidence that they've backed away from that
15 number. And until they do, I need to be prepared to
16 respond to it. Just like I am the 70 to
17 $137 million number or the $22 million number from
18 the Gurr report.
19     I'm, I guess, keeping my options open, if
20 you will, on what ultimately will be alleged or
21 argued by the plaintiff.
22     Q. So if I can summarize, the presuit
23 information that you reviewed and you relied upon is
24 to be prepared to respond to that claim should the
25 plaintiff's present evidence that that's the amount

1  of damage they sustained?
2      A. Well, sure. If Mr. Harper or Mr. Philpot
3  go to court and say they've been damaged by
4  $1.8 million and I'm asked to respond to that, yes,
5  I'd like to see everything I can that supports that
6  claim, so that I can give my impressions of that
7  number. And if they don't go to court and say, 1.8,
8  then I would say it's less of a consequence
9  certainly in my evaluation.
10     Q. Is it relevant at all if those aren't the
11 damages claimed in front of a jury in the
12 conclusions that you've reached?
13     A. As I sit here, I can't envision that they
14 would be. If I received a letter from the plaintiff
15 that said that those numbers are no longer valid,
16 don't pay attention to them anymore, I wouldn't need
17 to know more about them. Then we're moving on to
18 what they are saying their damages are.
19     Again, as I sit here trying to answer that,
20 I'm not sure how that would play into any opinion of
21 mine at that point.
22     Q. Your task, as you understood it, is to
23 evaluate whether the underlying predicate facts
24 support the damages claimed by the plaintiff?
25     A. Partly, certainly.

1      Q. And if they are not claiming damages, say,
2  consistent with the presuit package, you would agree
3  that it's not necessary for you to evaluate the
4  underlying predicate facts?
5      A. Sure. I can see -- and, again, the reason
6  for the inclusion of -- I know I've written in my
7  reports that we start at 1.8 and then we go to 70,
8  to 130. A lot of that is because I don't know, as I
9  sit here, what is being argued or what ultimately
10 will be argued; 1.8, 137, 72, 22.5. I don't know
11 what the plaintiff is alleging in the way of
12 damages.
13     And once I do -- if I got some concrete
14 guidance from the plaintiff that said, disregard all
15 of these others, let's focus on this, then, I would.
16 I would focus on that, for sure.
17     Q. Let's go to page 11 of Exhibit 159, which
18 is your Preliminary Initial Rule 26 Disclosure.
19     A. I'm there, yes.
20     Q. And just so I understand how you approached
21 this, is it your testimony, Dr. Wolpert, that you've
22 reached eight specific opinions in connection with
23 the damages in this case -- actually, let me try
24 that again.
25     It looks like there's 6.8 subparts, 1

1  through 6; is that an accurate statement?
2    A.  That seems right, yes.
3    Q.  Under 6.2, it's titled, Lack of Evidentiary
4  Predicate, which we've been discussing this morning.
5  Can you tell me how you broke this down,
6  specifically, the lack of evidentiary predicate?
7  Are those specific examples of conclusions you
8  reached based upon the evidence that you relied upon
9  regarding lack of evidentiary predicate?
10    A.  Yes.  For the reasons listed on page 11 and
11  the top of page 12, yes.
12    Q.  And you're anticipating my next question.
13  That actually describes the specific item that you
14  considered and why that doesn't constitute a factual
15  predicate for the damage?
16    A.  Just in reviewing them, 6.2-I speaks to the
17  tax return and the financial statements.  I did
18  receive those.  I did review those.  I don't see
19  apparent evidence of a loss just in my review of
20  those.  So if they are some type of evidentiary
21  predicate for a loss, I'm not making that connection
22  based on my review of those documents.  6.2-II, is
23  more general insofar that the documents provided
24  indicate a predicate for a claim in this matter.
25        For instance the $1.8 billion presuit

1  number, or the $137 million Answers to Interrogatory
2  number.  There are numbers on the page but I didn't
3  receive nor review documents that would allow me to
4  analyze the information that is related to those
5  numbers, that underlies those numbers.  And that's
6  my customary role.
7        I'm certainly not opining that I will
8  decide whether there's a sufficient predicate or
9  not.  That's not my role.  I'm just saying from my
10  experience in reviewing cases, I don't see evidence
11  that supports those numbers.
12    Q.  And you actually, I think, summarize that
13  conclusion, if you look at 6.2, romanette ii(1) the
14  last sentence, you say, "in the current matter, the
15  absence of such documentation effectively prohibits
16  an economic analysis of the specific damages alleged
17  by Jameson."
18    A.  Right.
19    Q.  Is that basically the fundamental
20  conclusion that you've reached as a result of this
21  engagement?
22    A.  Certainly.  And I mentioned one anecdotal
23  of the 1.8 or the 137.
24        Another instance is the loss of sale number
25  that was put up or alleged by the plaintiff.  Where

1  are the documents that show that number, the time
2  frame, when that loss occurred, you know, for a
3  present value calculation.  Any of those things that
4  would permit an economic analysis on my part was
5  just void.  There wasn't information there to do so.
6    Q.  To summarize, I think, what you said, you
7  believe that you didn't have sufficient evidence to
8  reach the conclusions that the plaintiff's experts
9  reached?
10    A.  Well, the plaintiff's experts -- I don't
11  know of which plaintiff experts you speak.  It was
12  certainly mentioned by the plaintiff that there were
13  perhaps going to be experts involved.  The only
14  expert work product I received or reviewed was the
15  Durrance report -- or appraisals rather and the Gurr
16  report.  I haven't seen any other expert analyses.
17  So I haven't reviewed expert work beyond those
18  experts.
19        And, I'm sorry, maybe I'm not answering
20  what you're asking.  I apologize.
21    Q.  Actually, I think you did.
22    A.  Okay.
23    Q.  And let me just ask you, based upon those
24  two experts' reports, you've reached the conclusion
25  that there is inadequate evidence to support the

1  conclusions that they've reached?
2    A.  Well, no.  My opinion, as I mentioned in
3  the June 21st report is -- it's the potential
4  application of those numbers, not the conclusions
5  they reach.
6        I don't have any opinion on whether it
7  would take or not take $22.5 million to clean the
8  properties.  I don't have any opinion on the
9  differential established by the Durrance report.
10        It's the potential use.  And I don't know
11  how those numbers are even going to be used at this
12  point by the plaintiff to allege damages.  That's
13  where I'm taking issue with those documents.
14    Q.  And without knowing how the plaintiff
15  intends to use that information, how can you reach
16  conclusions that those reports don't support the
17  damages that the plaintiff seeks?
18    A.  I don't know that I specifically said that.
19    Q.  And maybe you didn't.  I'm just asking.
20    A.  Yeah.  Until I know what's being alleged or
21  how those documents are being used to support a
22  damage claim, I would agree with what you just said.
23  I don't know.  I don't know that they are even
24  alleging the Durrance, quote/unquote, damages
25  number.  I don't know that.

1    Q. If I could take a look at those materials.
2  Let's go off the record for a second here.
3        (Whereupon, there was a discussion
4        off the record.)
5  BY MR. ROCKE:
6    Q. Dr. Wolpert, just so there is some clarity
7  in the record, what I'm going to do is walk you
8  through the specific items that you specifically
9  identified that you relied on. And if you don't
10  mind, I'm just going to pencil in an A,
11  alphabetically, through those items. Do you have a
12  problem with that?
13    A. The only thing I have a problem with is, I
14  relied on all of those documents. When we went
15  through those earlier, you asked me which ones I was
16  more explicit in my reliance upon. And those are
17  the ones that come to mind. Every document I
18  received, I relied upon in formulating the opinion.
19    Q. So the exercise we went through where you
20  identified specific documents, did you put greater
21  emphasis on those documents?
22    A. From sitting here reviewing it as you
23  asked, that's the best I can do, yes.
24    Q. So your testimony is, everything that
25  you've identified as materials reviewed, you relied

1  on?
2    A. Well, they're reliance documents,
3  certainly. They either formulate a -- the case
4  management order, I relied upon to know what the
5  schedule of the trial is. The retainer agreement I
6  relied upon to continue this engagement and know who
7  to send the bills to.
8        Yes. I relied on every document on that
9  list. Many of them, I did not rely explicitly on.
10  And that's what I thought, when we went through
11  them, you were asking.
12    Q. In going through these materials in your
13  file. I don't see any notes or highlighting. Did
14  you maintain any notes or highlighting as you went
15  through this?
16    A. No.
17    Q. In reviewing the Polk County and
18  Hillsborough County Property Appraiser's website,
19  did you consider the value that the property
20  appraiser had indicated for the particular parcels
21  in reaching any of the conclusions in this case?
22    A. No.
23    Q. Was it primarily just to see where the
24  property is in relation to other properties?
25    A. Yes. To help me conceptualize, certainly.

1        I believe the transaction amounts of the million
2  dollar purchase price was on there. I recall seeing
3  that.
4    Q. Let's go ahead and mark -- first of all,
5  this information regarding the property appraiser
6  for Hillsborough County was one of the items you
7  mentioned as well?
8    A. It was listed on page 4 under Additional
9  Materials and Sources.
10    Q. Okay.
11    A. Those were the only documents that were not
12  provided by Mosaic counsel.
13    Q. Got it.
14        The labels included in Mr. Durrance's
15  report in your file, why do those appear there?
16    A. They were simply the two land value
17  scenarios that he arrived at. One was $202,900 in
18  Scenario 1. The other was $7,500 in Scenario 2.
19  Those are also found on page 1 of the report.
20        This all is in relation to the Hillsborough
21  Parcel 1, which, as I recall, was just used as an
22  example in my June 21st report for that one parcel.
23    Q. And also in the report you were provided
24  from Michael Gurr, the same thing, there are some
25  pages marked. Can you look at that, Dr. Wolpert,

1  and tell me why those pages have been marked?
2    A. I don't recall. These were on the
3  background pages. My focus was on the values, page
4  21 and 41. I did review the report. And I don't
5  recall why I tabbed this.
6        I don't have an opinion about his project
7  approach, which is tabbed on page 23; nor his
8  historical background section on page 24. As with
9  everything else in his report, I don't have an
10  opinion whether he's done it correctly, incorrectly
11  or otherwise.
12    Q. Let me hand you what we have marked as 158,
13  which, I believe, you testified represents your
14  engagement letter, correct?
15    A. Yes.
16    Q. I notice that there are invoices and checks
17  behind your engagement letter. Does that represent
18  the total amount that you've invoiced and been paid
19  for the services provided in this case?
20    A. Yes. I did spend perhaps an hour or two
21  yesterday afternoon, which has not been invoiced,
22  and then today, certainly. But up until yesterday,
23  yes, this is everything.
24    Q. And if you look towards the end, I believe
25  the total -- why don't you tell me, if you can, by

Pages 41 to 44

1  review of those materials what the total billings
2  has been as a result of your engagement in this
3  case?
4      A.  It appears that Raffa Consulting had
5  invoiced 60 hours of my time at $350 an hour.  The
6  total is -- appears to be $21,000.
7      Q.  All right.
8      Let me hand you the Amended Complaint that
9  you've identified you considered.  Were you also
10  provided the exhibits attached to the Amended
11  Complaint?
12     A.  I don't recall.
13     Q.  I didn't see them in your file.  So you
14 believe that if they were provided, they would be in
15 here?
16     A.  They would, yes.
17     Q.  What we will do, we previously marked and
18 you have identified your engagement letter and
19 invoices, which is Exhibit 158, your CV, which is
20 Exhibit 157, and your Preliminary Rule 26
21 Disclosure, which is 159.
22     I'm going to mark your Preliminary Rebuttal
23 Report as Exhibit 160.
24     And we are going to mark the rest of the
25 materials in your file as Composite 161.

1      (Exhibits Numbered 160 and 161 were
2  marked for identification.)
3  BY MR. ROCKE:
4      Q.  Before I let you go, was there anybody else
5  at your firm involved in this assignment?
6      A.  At the outset, in January, Dr. Raffa and I
7  both spoke to Mr. Spivey.  Since that time, he's not
8  been involved.  He is the principal of Raffa
9  Consulting.  Beyond that, no.
10     Q.  Have you talked to anyone else about the
11 conclusions that you've reached and the reports that
12 you've generated in this case, other than counsel
13 for Mosaic and Mr. Raffa?
14     A.  No.
15     Let me just add one correction to a
16 question you asked.  I don't recall receiving the
17 exhibits to the Amended Complaint.  I don't believe
18 I did or they, in all likelihood, would have been
19 printed.  I'm certainly willing to go to my office
20 and see that I got them.
21     Q.  If you would just let me know and you can
22 do it through, Bill, whether or not that's there.  I
23 just want to make sure that I have the totality of
24 the materials that you have.
25     A.  That's very fair and I understand.  I don't

1  think so.  We're usually pretty diligent about it,
2  so.  But if I did, I'll certainly let Bill know.
3      Q.  All right.  I appreciate that.
4      A.  Yep.
5      MR. ROCKE:  That's all the questions I
6  have.
7      MR. SPIVEY:  Dr. Wolpert, I want to ask
8  one or two follow-up questions.  I think it's
9  clear but I want to avoid any potential
10 uncertainty.
11         CROSS-EXAMINATION
12 BY MR. SPIVEY:
13     Q.  Early on in your deposition, after
14 Exhibit 158 had been marked, you provided some
15 testimony to the fact that you don't regard yourself
16 as an expert in real property numbers.  Do you
17 recall something to that effect?
18     A.  Yes.
19     Q.  It's my impression from following testimony
20 that you were saying you're not an expert in real
21 property valuation, in terms of appraisals.  Is that
22 what you were saying in that line of questioning and
23 answering?
24     MR. ROCKE:  Object to the form.
25     A.  Yes.  To be clear, I don't hold myself out

1  to do a valuation of real property.  I've certainly
2  relied upon valuations done by real property
3  experts.  And I have factored them in on numerous
4  occasions into damage assessment.  In that regard,
5  yes, I've seen the ones that were produced.  In this
6  case, just like every other case, I don't have an
7  opinion of the conclusions or assumptions used by
8  them.  It's how does it fit into the damage number
9  is what's of consequence to me.
10     MR. SPIVEY:  Thank you.
11     MR. ROCKE:  Nothing further.
12     MR. SPIVEY:  We'll read, please.
13
14
15         STIPULATION
16     It was hereby stipulated and agreed by and/or
17 and signing of the transcript would not be waived.
18 between counsel present that the exercise of reading
19         (Thereupon, the deposition was
20         concluded at 11:17 a.m.)
21
22
23
24
25

**49**

1    CERTIFICATE OF OATH
2    STATE OF FLORIDA
3    COUNTY OF ORANGE
4
5        I, the undersigned authority, certify that
6        EDWARD T. WOLPERT, Ph.D.,
7    personally appeared before me and was duly sworn.
8
9
10       Witness my hand and official seal this 13th
11   day of July, 2016.
12
13
14
15
16
17
18
19
20
21
22
23   _____
     Juanita A. Butler, Court Reporter
24   Notary Public, State of Florida
     Commission No. FF 944824
25   Expires: December 21, 2019


**50**

1    CERTIFICATE OF REPORTER
2    STATE OF FLORIDA
3    COUNTY OF ORANGE
4
5        I, JUANITA BUTLER, Court Reporter, Notary Public
6    that I stenographically reported the deposition at
7    the time and place so indicated and that my notes
8    were hereinafter reduced to a computer-generated
9    transcript. for the State of Florida at large, do
10   hereby certify
11       I FURTHER CERTIFY that I am not a relative,
12   employee, attorney, or counsel of any of the
13   parties' attorneys or counsel connected with the
14   action, nor am I financially interested in the
15   outcome of this litigation. parties, nor am I a
16   relative or employee of the
17
18       Dated this 3rd day of August, 2016.
19
20
21
22
23   _____
     Juanita A. Butler, Court Reporter
24   Notary Public, State of Florida
     Commission No. FF 944824
25   Expires: December 21, 2019


**51**

1                    ERRATA SHEET
2    STYLE:   JAMESON v MOSAIC
     WITNESS:  EDWARD T. WOLPERT, Ph.D.
3             RAFFA CONSULTING ECONOMISTS, INC.
     REPORTER: JUANITA BUTLER   TAKEN: JUL 13, 2016
4
5
6    PAGE NO.:  LINE:   CORRECTION AND/OR AMENDMENT:
7
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____
25


**52**

1        I HAVE READ THE FOREGOING TRANSCRIPTION
2    OF MY DEPOSITION AND EXCEPT FOR ANY CORRECTIONS
3    AND/OR AMENDMENTS APPENDED HERETO, I HEREBY THE
4    TESTIMONY GIVEN BY ME.SUBSCRIBE TO THE TRANSCRIPT AS
5    AN ACCURATE RECORD OF
6
7
8
9
10   _____
     EDWARD T. WOLPERT, Ph.D.
11   RAFFA CONSULTING ECONOMISTS, INC.
12
13
14
15
16
17   RETURN PAGES 51 AND 52 TO:
18       Integra Reporting Group, LLC
         114 S. Oregon Avenue
19       Tampa, Florida 33606
         813.868.5130 (O)
20   OR EMAIL:   Production@IntegraReporting.com
21
22
     CASE:    JAMESON v MOSAIC
23   WITNESS:  EDWARD T. WOLPERT, Ph.D.
              RAFFA CONSULTING ECONOMISTS, INC
24   TAKEN:   JULY 13, 2016
     REPORTER:  JUANITA A. BUTLER
25


Pages 49 to 52

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

53

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1
2
3   JAMESON LAND COMPANY, LLC,
        Plaintiff,
4
    vs.         CASE NO: 8:15-CV-00409-JDW-EAJ
5
    MOSAIC FERTILIZER, LLC.
6        Defendant.
    *****************************************
7   IN RE: DEPOSITION OF EDWARD T. WOLPERT, Ph.D.
8
9   August 3, 2016
10  I. WILLIAM SPIVEY, II, ESQUIRE
    SpiveyW@GTLaw.com
11      GREENBERG TRAURIG, P.A.
        450 SOUTH ORANGE AVENUE
12      SUITE 650
        ORLANDO, FLORIDA 32801
13
14  Dear Mr. Spivey:

15  The deposition of Dr. Wolpert taken on July 13, 2016
    in the above-styled matter has been transcribed.  At
16  the conclusion of the deposition, you requested your
    client read and sign the transcript.  Attached is a
17  copy of the transcript for his review.

18  After Dr. Wolpert makes any corrections he would
    like on the Errata Sheet (Page 51), please have him
19  sign the Signature Page (Page 52) and return both
    pages to Integra Reporting Group.
20  Once the Errata Sheet and Signature Page have been
    received, they will be forwarded to all parties.
21
    Thank you,
22
    Juanita A. Butler,
23  Stenographic Court Reporter
    INTEGRA REPORTING GROUP, LLC
24
        cc:   Robert Rocke, Esquire
25

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

**A**

a.m 1:18,19
  48:20
ability 15:12
able 21:22
above-styled
  53:15
absence 38:15
Absolutely 11:15
account 20:20
accurate 11:14
  15:14 25:4
  37:1 52:5
accurately 15:15
act 10:13
action 50:14
add 23:1 46:15
addendum
  28:24
additional 19:17
  27:16 28:2,2,7
  29:1,21 43:8
address 29:9,21
addressed 7:9
  33:11
adds 29:13
affirm 4:3
afternoon 44:21
ago 29:24 31:16
agree 10:4 31:8
  36:2 40:22
agreed 48:16
agreement 18:1
  18:9 19:14
  42:5
ahead 5:19 7:4
  43:4
allegation 9:21
  14:11
allege 40:12
alleged 9:17 14:9
  14:16 21:3
  30:1 33:24
  34:2,20 38:16
  38:25 40:20
alleging 36:11
  40:24

allow 15:11 38:3
alphabetically
  41:11
Amended 18:6
  30:17 32:1
  45:8,10 46:17
AMENDMENT
  51:6
AMENDMEN...
  52:3
amount 14:15
  31:19,20 34:25
  44:18
amounts 43:1
analogy 20:25
analyses 39:16
analysis 9:25
  25:9 38:16
  39:4
analytic 15:23
analyze 21:5
  38:4
and/or 48:16
  51:6 52:3
anecdotal 38:22
Annette 1:22
answer 9:6
  17:11 28:2
  34:11 35:19
answered 23:3
answering 39:19
  47:23
answers 9:19
  18:12 29:25
  34:8 38:1
anticipate 28:1
anticipating
  37:12
anybody 46:4
anymore 34:10
  35:16
apologize 23:3
  39:20
apparent 37:19
appear 43:15
appeared 49:7
appears 14:9

33:3,5 45:4,6
APPENDED
  52:3
application
  25:18 40:4
apply 24:18,21
  32:20
appraisal 10:21
  23:18 27:1
appraisals 10:23
  23:21 26:7
  28:11 30:7
  33:4 39:15
  47:21
appraiser 5:17
  9:2,25 10:5,13
  19:20 23:21
  25:23 42:20
  43:5
appraiser's
  25:21 42:18
appraisers 10:22
appreciate 47:3
approach 17:13
  25:15,15,15
  44:7
approached
  36:20
approximately
  6:23 7:1
April 18:15,18
area 22:12
argued 14:16
  34:21 36:9,10
arrived 10:7
  43:17
articulate 34:3
articulated 14:8
  15:21 17:14
  30:17 32:6
asked 4:17 9:13
  23:13,15,22,25
  28:3,15 35:4
  41:15,23 46:16
asking 8:9 39:20
  40:19 42:11
aspects 22:24

assess 15:2 24:15
assessment
  26:11 29:10
  33:6 48:4
assignment
  13:23 46:5
assist 7:21,23
  9:16 13:23
  22:14
assumptions
  10:9 15:14
  24:8,14 48:7
attached 45:10
  53:16
attention 35:16
attorney 50:12
attorneys 50:13
August 50:18
  53:9
authority 8:23
  11:6 49:5
available 28:20
Avenue 1:20 2:3
  2:8 52:18
  53:11
avoid 47:9
aware 11:23
  12:5 13:3,6
  22:7 23:4,8
  26:3 31:23
  32:2,21

**B**

back 14:7 26:18
  27:25 29:23
backed 34:14
background 9:4
  11:8 12:16
  13:13 17:10
  19:11,22 24:6
  44:3,8
bank 18:20,21
  20:20 23:19
based 8:17 10:8
  21:20 24:7
  25:18 27:3,16
  28:19,25 29:24

30:15 33:5
  37:8,22 39:23
basically 38:19
basis 21:5
behalf 6:8 23:6
belabor 25:1
believe 6:17 8:15
  8:20 12:21
  13:8 21:20
  27:8,22 39:7
  43:1 44:13,24
  45:14 46:17
believed 16:21
benefit 20:2
best 9:6 17:10,20
  41:23
beyond 22:23
  39:17 46:9
Bill 46:22 47:2
billings 45:1
billion 34:13
  37:25
bills 42:7
bit 4:22
Bob 4:15
bottom 21:8
bring 4:17
broke 37:5
brought 4:18
business 25:25
Butler 1:22
  49:23 50:5,23
  51:3 52:24
  53:22

**C**

C 2:1 4:1
calculating 9:10
calculation
  15:15 39:3
calculations 15:2
capacity 8:10
  10:14
case 1:5 4:4 6:8
  7:17 8:13 9:14
  11:10 12:7
  13:18 15:2,18

16:23 19:1
20:5 21:4 23:6
23:17 24:2
30:10 31:24
36:23 42:3,21
44:19 45:3
46:12 48:6,6
52:22 53:4
**cases** 14:2 19:2
32:3,4,5,9 33:9
38:10
**caught** 25:5
**causality** 30:20
**causation** 15:9
31:18
**cause** 30:25
**caveat** 5:5
**cc** 53:24
**certain** 8:16
10:12
**certainly** 5:22
8:25 9:10
17:12 19:11,11
21:15 23:1,22
23:25 26:2
27:20 28:4
30:21 32:11
33:13 34:1
35:9,25 38:7
38:22 39:12
42:3,25 44:22
46:19 47:2
48:1
**CERTIFICATE**
2:21,22 49:1
50:1
**certify** 49:5
50:10,11
**Chad** 11:12
**challenge** 12:4
**challenges** 11:25
**change** 29:18,21
**characterize**
29:20
**checks** 44:16
**chronology** 6:18
34:4,6

**circumstances**
8:21
**claim** 34:24 35:6
37:24 40:22
**claimed** 5:6,8
35:11,24
**claiming** 36:1
**claims** 22:9
30:17 32:1
**clarity** 41:6
**clean** 40:7
**clear** 14:10
25:13 27:14
28:21 29:24
47:9,25
**client** 21:12
53:16
**Closing** 18:19
**combined** 18:19
**come** 15:13
20:19 21:6
41:17
**comes** 31:19
**Commencing**
1:18
**Commission**
1:24 49:24
50:24
**Company** 1:3
4:15 53:3
**comparative**
25:9
**compare** 22:21
**compilation**
16:18
**complaining** 8:6
**Complaint** 18:6
30:17 32:1
45:8,11 46:17
**complete** 16:2
**component**
30:20,20,21
**components**
15:9
**Composite** 3:9
45:25
**computer-gen...**

50:8
**concept** 11:24
**conceptualize**
19:18 42:25
**concern** 23:15
25:13
**concluded** 48:20
**Concluding** 1:19
**conclusion** 31:9
31:21,25 38:13
38:20 39:24
53:15
**conclusions** 15:6
17:14,18 24:5
24:7,11,23
25:4,16,18,24
26:5 27:3,23
28:6,8,19
29:16,18 32:5
32:6,13 33:22
35:12 37:7
39:8 40:1,4,16
42:21 46:11
48:7
**concrete** 36:13
**conducting** 26:7
**connected** 50:13
**connection** 6:16
10:1 16:13
36:22 37:21
**consequence**
24:22 35:8
48:9
**consider** 15:8
42:19
**considered** 10:1
37:14 45:9
**consistent** 22:17
36:2
**constitute** 37:14
**Consulting** 1:12
3:5 6:21 45:4
46:9 51:3
52:11,23
**contact** 6:18,20
**contacted** 6:15
6:17

**contained** 17:16
29:17 32:5
**contamination**
12:15 22:9
23:5
**context** 32:20
**continue** 42:6
**contrast** 22:21
**conversations**
20:8
**converse** 8:20
**copies** 5:20
**copy** 6:5 12:19
16:10 53:16
**CORPORATE**
1:11
**correct** 7:10
10:7,18 11:13
11:18 12:20
13:16 22:12,13
22:25 23:1
24:12,16,24
27:5,11 44:14
**correction** 46:15
51:6
**corrections** 52:2
53:17
**correctly** 44:10
**correspondence**
19:5,6
**cost** 25:15 31:25
32:19,24 33:2
**counsel** 1:17 2:5
2:10 5:6 16:19
20:25 23:20
34:1 43:12
46:12 48:18
50:12,13
**County** 5:15,16
42:17,18 43:6
49:3 50:3
**couple** 13:1
**court** 1:1,23 4:2
4:7 8:25 11:21
34:12 35:3,7
49:23 50:5,23
53:1,23

**courts** 11:18
**covering** 30:5
**CROSS** 2:19
**CROSS-EXA...**
47:11
**current** 6:5 27:1
38:14
**curriculum** 3:3
6:5 12:20 16:2
**customary** 38:6
**cut** 24:25
**CV** 10:16 15:25
45:19

**D**

**D** 4:1
**damage** 9:11,25
15:15 18:7
20:11,17,24
22:20 29:10
30:21,25 31:2
31:4,6,13,20
35:1 37:15
40:22 48:4,8
**damaged** 20:16
30:16 31:15,17
34:13 35:3
**damages** 6:7
7:21,23 8:2,5
8:11,12,16,22
9:1,1,5,13,16
9:17,21 13:23
14:9,11,16,19
15:11 20:14
21:3,12 24:21
26:12,12,18
30:3,9 33:25
33:25 34:5
35:11,18,24
36:1,12,23
38:16 40:12,17
40:24
**data** 14:25 29:22
**date** 1:16 25:14
25:21 26:1,20
26:25 27:3,5
28:17

dated 3:5 29:13 50:18
dates 26:4
Daubert 11:25 12:3
day 49:11 50:18
Dear 53:13
December 1:24 49:25 50:25
decide 38:8
decided 16:16
Defendant 1:7 2:10 53:6
Defendant's 19:2
defense 33:25
delivered 5:1,9
Demand 9:18 18:9 21:1 29:25 33:17,21 34:5,9
deposition 1:10 3:10 28:1 47:13 48:19 50:6 52:2 53:7 53:14,15
described 21:21 26:25 27:17
describes 27:12 37:13
determination 21:14
determine 8:25 13:12 15:10 22:15
determining 9:8
devote 17:23
difference 9:8
differential 9:3 40:9
difficult 14:14 20:23
diligent 47:1
diminution 32:23
DIRECT 2:18 4:12

Disclosure 3:6,8 16:11 18:5 21:2 32:8,8 34:8 36:18 45:21
discussed 7:12
discussing 37:4
discussion 41:3
dispute 12:25 13:7
disregard 36:14
distance 34:6
distinction 31:1
DISTRICT 1:1 1:1 53:1,1
DIVISION 1:2 53:2
Doctrine 32:15 33:11
document 6:4 17:3,8 18:2 41:17 42:8
documentation 38:15
documents 5:3 12:22 15:11 18:3 20:3,6,19 21:7 22:19 29:1 33:5 37:22,23 38:3 39:1 40:13,21 41:14,20,21 42:2 43:11
doing 7:25 28:1
dollar 14:15 43:2
Dr 3:7,8 4:14 5:2 14:1 17:22 29:12 33:16 36:21 41:6 43:25 46:6 47:7 53:14,17
duly 4:10 49:7
duplication 18:23
Durrance 11:12 24:5,14,19

25:3,7 26:4 28:11 30:7 39:15 40:9,24
Durrance's 43:14

E
E 2:1,1 4:1,1
earlier 22:11 41:15
Early 47:13
economic 32:15 32:20 33:10 38:16 39:4
economist 20:23
ECONOMISTS 1:12 3:5 51:3 52:11,23
education 8:18 13:13
EDWARD 1:10 2:17 3:3,7,8 4:9 49:6 51:2 52:10,23 53:7
effect 47:17
effectively 38:15
efforts 19:18
eight 21:25 22:4 36:22
either 15:8 25:2 29:9 42:3
email 18:13,18 18:21 19:4 52:20
emails 5:5 20:19 21:6
emphasis 41:21
employee 50:12 50:16
engage 6:20
engaged 6:7 8:8 11:21
engagement 3:4 5:3 6:16,25 7:2 7:4,9,13,14,16 7:20,22 9:12 9:15 10:2

13:18,20 15:4 16:14 24:2 38:21 42:6 44:14,17 45:2 45:18
engagements 29:5
engaging 7:17
engineer 13:4,16 31:23
engineering 13:9
engineers 22:8
entitled 8:5
environmental 12:14 22:24 28:10
Errata 2:23 51:1 53:18,20
Esquire 2:2,7 53:10,24
essence 14:5,6
established 21:16 40:9
estate 9:2
estimation 15:8
evaluate 14:2 15:5 21:11 22:8 24:3,10 26:20,22,22 31:9 32:5,10 32:19 35:23 36:3
evaluated 23:5
evaluating 10:6 11:13
evaluation 21:21 26:23 35:9
evidence 21:11 31:5,7,10,12 32:22,25 34:14 34:25 37:8,19 38:10 39:7,25
evidentiary 37:3 37:6,9,20
evolution 34:4
evolved 14:13
evolving 14:7

exactly 14:14
EXAMINATI... 2:16 4:12
examined 4:11 31:11
example 18:2 43:22
examples 37:7
excess 33:7
exercise 41:19 48:18
Exhibit 3:1 5:24 6:1 7:6 16:1,4 16:7 17:15 36:17 45:19,20 45:23 47:14
exhibits 45:10 46:1,17
exist 15:20
exists 31:13
expenses 12:15
experience 7:25 8:15,18 9:10 13:13 14:1,20 29:4 38:10
expert 6:8 8:2,11 8:22 11:17,21 14:18,24 19:15 20:24 22:19 31:24 32:10 33:25 39:14,16 39:17 47:16,20
expert's 15:5
expertise 9:4,8 10:9 22:12
experts 14:3 22:17 23:4,9 39:8,10,11,13 39:18 48:3
experts' 39:24
Expires 1:24 49:25 50:25
explicit 41:16
explicitly 17:9 17:11 19:9,13 19:22 42:9

**F**

fact 47:15
factor 25:22
factored 48:3
facts 26:3 35:23
 36:4
factual 15:5,19
 20:22 21:9,16
 22:16 37:14
fair 21:24 25:19
 46:25
falls 25:11
familiar 10:20
 11:24
far 8:25 14:12
 19:21 20:9
 21:8 33:4
February 18:21
federal 11:18
FERTILIZER
 1:6 53:5
FF 1:24 49:24
 50:24
file 4:24 5:10
 42:13 43:15
 45:13,25
final 27:14,22
 28:6,8,19
financial 18:17
 37:17
financially 50:14
find 19:8
firm 6:10 14:23
 46:5
first 4:10 6:12
 6:23 18:12
 19:8 43:4
fit 26:11 48:8
Florida 1:1,21
 1:23 2:4,9
 10:12 11:2
 13:5,16 26:8
 49:2,24 50:2,9
 50:24 52:19
 53:1,12
focus 31:3 36:15
 36:16 44:3

follow 8:9
follow-up 47:8
followed 11:2
following 47:19
follows 4:11
FOREGOING
 52:1
form 47:24
formulate 8:4
 9:13 42:3
formulating
 8:12 17:1 20:4
 26:21 41:18
forth 15:15
forwarded 53:20
found 43:19
four 19:2
frame 39:2
front 35:11
fundamental
 38:19
further 48:11
 50:11
future 28:15

**G**

G 4:1
general 20:8,24
 37:23
Generally 10:24
generated 7:13
 46:12
getting 21:8
give 4:4 5:20
 29:3 35:6
GIVEN 52:4
global 20:9
go 5:19 7:4
 17:20 18:4
 19:18 21:7
 24:6 27:25
 29:23 35:3,7
 36:7,17 41:2
 43:4 46:4,19
goes 26:18
going 4:21,21
 5:23 17:22

39:13 40:11
 41:7,10 42:12
 45:22,24
good 4:14 22:18
Google 19:20
greater 32:24
 41:20
Greenberg 1:20
 2:8 6:10 18:15
 53:11
Gremley 18:14
 19:7
groundwater
 12:14
Group 52:18
 53:19,23
guess 23:14 34:5
 34:19
guidance 36:14
guidelines 26:6
Gurr 12:8 13:4
 22:16,21 23:2
 25:3 28:10
 33:1,6 34:18
 39:15 43:24
Gurr's 12:11
 22:25 30:6

**H**

Hall 19:3,4
hand 5:23 16:7
 44:12 45:8
 49:10
happened 28:9
Harden 18:13
Harper 18:16
 35:2
help 42:25
hereinafter 50:8
HERETO 52:3
hesitant 14:6
highlighting
 42:13,14
Hillsborough
 5:15 42:18
 43:6,20
hired 13:22 14:2

14:22,23 16:22
 21:10 22:7
 23:9 31:23
 32:19 33:25
historical 44:8
hold 47:25
hour 44:20 45:5
hours 45:5

**I**

idea 33:16,18,20
identification
 6:2 7:7 16:5
 46:2
identified 12:22
 17:4 20:4
 23:10 32:3
 41:9,20,25
 45:9,18
identifies 16:12
identify 18:3
II 2:7 53:10
ii(1) 38:13
imagine 25:25
impact 22:3 28:8
 32:12 33:21
important 26:1
 31:1
impression
 47:19
impressions 35:6
inadequate
 39:25
included 5:7
 43:14
inclusion 36:6
income 25:15
inconsistent
 26:6
incorrect 11:14
 24:17 25:6
incorrectly
 44:10
INDEX 2:16 3:1
indicate 37:24
indicated 20:12
 23:20 28:21

42:20 50:7
information
 18:20 20:9,13
 22:15 26:16,17
 27:17,18 28:3
 28:7,19 34:23
 38:4 39:5
 40:15 43:5
initial 13:18
 27:12 29:19
 32:4,7 36:18
initially 6:15
insofar 24:13
 37:23
instance 9:2,7
 20:15 25:6
 37:25 38:24
instances 14:22
 15:3
Institute 10:22
 11:3
Integra 52:18
 53:19,23
intends 40:15
Intent 19:3
interested 7:17
 24:1 50:14
interpretation
 17:7
interrogatories
 9:19 18:12
 29:25
interrogatory
 34:9 38:1
introduced 4:14
invalid 26:10
invision 35:13
invoiced 44:18
 44:21 45:5
invoices 44:16
 45:19
involved 39:13
 46:5,8
issue 22:1 26:13
 33:11 40:13
issues 13:10 23:5
 27:2

**item** 18:16,17,22 37:13
**items** 17:16 41:8 41:11 43:6
**iterations** 9:17 34:7

**J**

**Jameson** 1:3 4:15 5:4 19:15 34:12 38:17 51:2 52:22 53:3
**JAN** 3:5
**January** 7:1,3 14:8 46:6
**jobs** 16:22
**Juanita** 1:22 49:23 50:5,23 51:3 52:24 53:22
**judge** 21:15
**JUL** 51:3
**July** 1:16 49:11 52:24 53:14
**JUN** 3:7
**June** 5:15 16:10 25:7 27:8 28:5 28:11,12,18,22 28:22,23,24 29:13,14,17,19 34:3 40:3 43:22
**jury** 35:11

**K**

**keep** 30:4
**keeping** 34:19
**know** 6:18,22,23 12:11 14:14 21:18 22:11,24 23:16 30:4,14 32:22 33:20 34:2,11,12 35:17 36:6,8 36:10 39:2,11 40:10,18,20,23 40:23,25 42:4

42:6 46:21 47:2
**knowing** 40:14

**L**

**L** 2:2 48:15
**labels** 43:14
**lack** 37:3,6,9
**land** 1:3 4:15 19:7 43:16 53:3
**large** 50:9
**latest** 16:2
**law** 6:10 10:12 19:1
**lawsuit** 4:16 5:4 8:7 15:10 22:1 22:5,9
**legal** 21:14 32:10 32:16
**let's** 7:4 29:2 36:15,17 41:2 43:4
**letter** 2:25 3:4 7:3,5,9,14,16 9:18 18:15,25 35:14 44:14,17 45:18
**level** 20:9
**liability** 15:9 30:19 31:18
**liable** 30:22
**licensed** 10:17 10:22 11:1 13:4,15
**licensure** 10:12
**likelihood** 46:18
**limit** 32:16
**line** 18:16,17,22 20:25 47:22 51:6
**list** 16:20 42:9
**listed** 37:10 43:8
**lists** 26:23
**litigation** 50:15
**little** 4:22 29:24 33:12

**LLC** 1:3,6 52:18 53:3,5,23
**LOCATION** 1:20
**longer** 35:15
**look** 4:21,24 12:23 17:21 24:4 29:3 38:13 41:1 43:25 44:24
**looked** 19:19
**looking** 30:6 33:15
**looks** 36:25
**loop** 28:5
**loss** 8:6 37:19,21 38:24 39:2
**losses** 33:24
**lot** 9:10 17:23 21:2 27:18 36:8

**M**

**MACDILL** 2:3
**MAI** 11:1
**maintain** 42:14
**making** 37:21
**management** 42:4
**mandated** 11:3
**Manufacturing** 19:4,5
**maps** 19:20
**March** 25:8,19 26:10,14,15
**mark** 5:19,23 7:4 43:4 45:22 45:24
**marked** 6:2 7:6 16:1,4 43:25 44:1,12 45:17 46:2 47:14
**market** 21:25 25:14,19 26:24
**material** 5:13 30:5
**materials** 3:9

4:17,18,22 5:1 5:9 16:13,16 16:21,25 19:17 21:21 23:10 30:15 41:1,25 42:12 43:9 45:1,25 46:24
**matter** 7:20 15:4 16:11 17:10 26:12,15 37:24 38:14 53:15
**matters** 17:23
**MCLEAN** 2:3
**ME.SUBSCR...** 52:4
**mean** 20:14
**Meaning** 34:7
**measured** 26:14
**mentioned** 5:14 12:6 19:1 29:12,23 38:22 39:12 40:2 43:7
**met** 11:2
**methodologies** 10:21 25:2
**methodology** 24:10,15,16 25:12,23
**methods** 11:12
**Michael** 12:8 13:3 43:24
**MIDDLE** 1:1 53:1
**million** 33:2,3,4 34:17,17 35:4 38:1 40:7 43:1
**mind** 5:19 41:10 41:17
**mine** 35:21
**moment** 29:2 31:16
**month** 27:20
**morning** 4:14 5:2 14:10 37:4
**Mosaic** 1:6 5:3,6 6:8,24 20:25

22:7,19 23:6 23:20 30:22 32:18 43:12 46:13 51:2 52:22 53:5
**Mosaic's** 22:17 22:25 31:23
**move** 15:25
**moving** 27:24 35:17

**N**

**N** 2:1 4:1 48:15
**near** 7:2
**necessarily** 15:7
**necessary** 16:22 36:3
**necessitated** 28:12 31:25
**need** 21:18 34:15 35:16
**needed** 7:21
**Notary** 1:23 49:24 50:5,24
**note** 24:14
**noted** 25:6
**notes** 42:13,14 50:7
**notice** 1:17 9:1 18:11 19:3 44:16
**noticed** 25:7
**notion** 32:14
**number** 6:1 7:6 16:4 20:14,17 22:25,25 30:2 34:15,17,17 35:7 38:1,2,24 39:1 40:25 48:8
**Numbered** 46:1
**numbers** 9:3,9 9:11 20:10,11 21:2,9,19 24:21 25:8,9 26:10 30:1 35:15 38:2,5,5

38:11 40:4,11
47:16
**numerous** 48:3

_____

**O**

**O** 4:1 48:15
52:19
**oath** 2:21 4:11
49:1
**Object** 47:24
**observed** 15:22
**obviously** 13:15
18:1
**occasions** 11:20
48:4
**occurred** 39:2
**October** 18:13
**offer** 8:17,22
10:5 15:12
**offering** 11:10
25:1
**office** 6:17 46:19
**official** 49:10
**Okay** 4:20 39:22
43:10
**once** 36:13 53:20
**ones** 41:15,17
48:5
**ongoing** 22:4
**online** 19:18
**open** 17:6 34:19
**opining** 38:7
**opinion** 9:5 10:5
10:8,10,17,25
11:11,22 12:4
12:16,17 17:1
20:5 21:24
22:3,23 25:2,9
26:19,21,24
27:21 30:8,12
30:22 31:14,17
31:24 33:1
35:20 40:2,6,8
41:18 44:6,10
48:7
**opinions** 8:4,17
9:4 12:2 13:9

14:3,8 27:14
28:22 29:9
31:18 36:22
**options** 34:19
**Orange** 1:20 2:8
49:3 50:3
53:11
**order** 21:19
22:15 42:4
**Oregon** 52:18
**originals** 5:20
**Orlando** 1:21
2:9 53:12
**outcome** 50:15
**outset** 46:6

_____

**P**

**P** 2:1,1 4:1 48:15
**P.A** 1:20 2:3,8
53:11
**package** 18:7,10
33:17,21 36:2
**page** 2:17 3:2
16:12 19:2
36:17 37:10,11
38:2 43:8,19
44:3,7,8 51:6
53:18,18,18,20
**pages** 13:1 18:6
43:25 44:1,3
52:17 53:19
**paid** 44:18
**paper** 13:1
**Paragraph** 17:4
17:16
**parcel** 43:21,22
**parcels** 22:5
42:20
**part** 12:21 15:4
21:10 24:2
25:17 39:4
**particular** 8:12
9:12 42:20
**parties** 50:15
53:20
**parties'** 50:13
**Partly** 35:25

**party** 8:5,6 12:3
29:10
**pay** 35:16
**pencil** 41:10
**perform** 10:22
16:22
**performed** 23:19
**permit** 22:21
39:4
**personally** 49:7
**perspective**
15:12 21:18
22:20
**Ph.D** 1:10 2:17
3:3 4:9 49:6
51:2 52:10,23
53:7
**Philpot** 35:2
**pieces** 21:25
23:19
**place** 6:19 28:14
50:7
**plaintiff** 1:4,17
2:5 9:18 14:17
20:11 21:3,15
30:2,9 33:24
34:21 35:14,24
36:11,14 38:25
39:11,12 40:12
40:14,17 53:3
**plaintiff's** 16:19
18:5,7,11
34:25 39:8,10
**Platinum** 18:20
**play** 35:20
**please** 48:12
53:18
**point** 9:20 25:1
28:1,15 35:21
40:12
**Polk** 5:16 42:17
**position** 15:18
**possible** 13:1
**potential** 25:18
26:12,17 32:16
40:3,10 47:9
**precise** 13:19

**preconceived**
32:14
**predicate** 14:15
14:25 15:5,16
15:19 20:10,13
20:22 21:9,16
35:23 36:4
37:4,6,9,15,21
37:24 38:8
**predicates** 22:16
**preliminary** 3:6
3:8 12:7 16:11
17:15 27:13
28:17 29:12
32:7,8 36:18
45:20,22
**prepared** 20:11
29:4 34:15,24
**present** 34:25
39:3 48:18
**presented** 14:7
20:18
**presuit** 9:18 18:7
21:1 29:25
33:17,21 34:5
34:9,22 36:2
37:25
**pretty** 47:1
**prevailed** 12:3
**previous** 34:7
**previously** 33:23
45:17
**price** 43:2
**primarily** 42:23
**principal** 46:8
**print** 13:2
**printed** 46:19
**printouts** 5:14
**prior** 14:2 29:5
**privilege** 5:6,8
**probably** 17:20
**problem** 41:12
41:13
**procedures** 11:3
11:12
**process** 4:24
**processes** 11:12

**produced** 3:10
48:5
**product** 24:3
39:14
**Production@I...**
52:20
**professional**
12:12 13:4,16
22:8
**progress** 9:22
**progression** 15:1
**prohibited** 11:21
**prohibits** 38:15
**project** 44:6
**properties** 19:21
40:8 42:24
**property** 5:17
9:5,9 10:6,6,7
10:8,18,23
11:13 19:19,19
21:25 23:20,21
26:7,25 32:17
32:23 33:3,7,8
42:18,19,24
43:5 47:16,21
48:1,2
**provide** 31:24
33:16
**provided** 12:19
12:25 16:21
27:19 28:3,13
33:10 37:23
43:12,23 44:19
45:10,14 47:14
**proviso** 28:7
**Public** 1:23
49:24 50:5,24
**pull** 33:13
**purchase** 19:14
43:2
**purchased** 33:3
**purpose** 7:19
13:19 21:10
29:7
**PURSUANT**
1:17
**put** 38:25 41:20

## Q

qualified 8:16,21
  8:24 10:4 11:5
  11:7,7,17
  12:17 13:8
quantifying
  31:19
question 8:10
  9:7 22:18
  29:11 37:12
  46:16
questioning
  47:22
questions 47:5,8
quick 4:21
quickly 17:21
quite 15:12
quote/unquote
  9:5 40:24

## R

R 2:1 4:1
Raffa 1:12 3:5
  6:21 45:4 46:6
  46:8,13 51:3
  52:11,23
range 14:9
reach 25:16,24
  31:8 39:8 40:5
  40:15
reached 24:7,23
  26:5 27:22
  28:6 29:18
  30:8,12 31:24
  32:13 33:22
  35:12 36:22
  37:8 38:20
  39:9,24 40:1
  46:11
reaching 17:14
  17:17 24:11
  25:3,23 26:5
  32:6 42:21
read 2:25 48:12
  52:1 53:16
reading 48:18
real 9:2,5,9 10:6

10:7,8,18,23
  21:25 23:21
  26:7 47:16,20
  48:1,2
realm 14:18
reason 12:25
  13:7 14:6
  17:22 29:11
  36:5
reasonable 34:1
reasons 14:15
  37:10
rebut 14:24
rebuttal 3:8 12:8
  14:23 21:17
  28:18 29:5,8
  29:13,17 32:8
  45:22
recall 6:11 12:8
  20:7 43:2,21
  44:2,5 45:12
  46:16 47:17
receipt 27:16
  28:25
receive 37:18
  38:3
received 9:16
  17:7 18:9 21:1
  27:18 28:10
  29:22 30:5
  31:5,11 33:1
  35:14 39:14
  41:18 53:20
receiving 20:9
  46:16
reclamation
  22:4,8 23:5
recollection 7:12
  33:12
record 16:9
  25:13 27:7
  41:2,4,7 52:5
records 20:20
  21:7
reduced 50:8
Reed 19:16
  23:11 24:3,10

24:18 26:20
referring 19:6
regard 8:5 10:5
  10:17 11:11
  12:2 13:9
  26:15 27:2
  47:15 48:4
regarding 6:24
  12:14 21:24
  25:2 33:10
  37:9 43:5
regards 9:9
related 5:3 18:20
  38:4
relation 42:24
  43:20
relative 50:11,16
relayed 15:14
  23:15
relevant 35:10
reliance 41:16
  42:2
relied 17:8,9,11
  17:17 18:4
  19:9,13 20:4
  22:16 23:11
  24:8 34:23
  37:8 41:9,14
  41:18,25 42:4
  42:6,8 48:2
rely 16:25 17:5,6
  17:23 18:2
  19:22 42:9
remainder 3:9
  5:7
remediation
  12:15 32:16
render 10:17
  12:17 13:9
rendered 10:25
  12:3,4
rendering 9:4
  11:22
replace 28:23
replicated 18:8
report 5:15
  11:15 12:6,7,8

12:13,14 14:25
  17:4,15,17
  19:15 23:11,23
  24:4 25:7 26:6
  26:24 27:5,12
  27:13,17,19
  28:10,12,18,23
  28:24 29:3,8
  29:13,14,17,19
  30:6 32:4 34:4
  34:18 39:15,16
  40:3,9 43:15
  43:19,22,23
  44:4,9 45:23
reported 1:22
  50:6
Reporter 1:23
  2:22 4:2,7
  49:23 50:1,5
  50:23 51:3
  52:24 53:23
Reporting 52:18
  53:19,23
reports 15:22
  23:7 29:5 36:7
  39:24 40:16
  46:11
represent 4:15
  5:10 44:17
representative
  1:11 6:24
represents 28:18
  44:13
request 20:24
requested 53:15
required 10:21
requirements
  10:13 11:2
reserve 27:20
respond 20:23
  21:19 34:16,24
  35:4
responding
  14:12,13,18
response 9:23
  21:4,18 25:6
rest 45:24

restoration
  31:25 32:24
  33:2
restorative
  32:19
restore 33:7
result 14:12
  30:16 38:20
  45:2
retainer 18:1,9
  42:5
return 18:16
  37:17 52:17
  53:18
review 14:23
  15:13 16:17
  28:3 32:4
  37:18,19,22
  38:3 44:4 45:1
  53:16
reviewed 9:17
  16:13 17:1,7
  19:12 24:4
  27:19 30:15
  32:9,11 33:13
  34:23 39:14,17
  41:25
reviewing 10:16
  37:16 38:10
  41:22 42:17
right 5:12 24:20
  27:21 29:15
  37:2 38:18
  45:7 47:3
Robbins 19:4,5
Robert 2:2 53:24
Rocke 2:2,3,18
  4:13,15 6:3 7:8
  16:6 41:5 46:3
  47:5,24 48:11
  53:24
role 14:7,13,17
  38:6,9
romanette 38:13
RRocke@RM...
  2:2
Rule 3:6,8 12:21

16:11 18:5
21:1 32:7 34:8
36:18 45:20

**S**

S 2:1 48:15
52:18
sale 19:14 38:24
save 13:1
saying 26:11
31:20 35:18
38:9 47:20,22
SBAR 2:3
scenario 28:14
43:18,18
scenarios 43:17
schedule 42:5
seal 49:10
second 16:12
18:25 41:2
Secondarily
30:24
section 44:8
see 12:24 16:14
17:13 19:20
23:22 31:5,12
31:12 34:1,7
35:5 36:5
37:18 38:10
42:13,23 45:13
46:20
seeing 43:2
seeks 40:17
seen 15:3 23:7
31:7 34:14
39:16 48:5
Seller 19:15
send 42:7
sent 7:3
sentence 38:14
serve 19:3 20:10
served 20:13
services 44:19
Serving 18:11
set 10:9 18:12
Sheet 2:23 51:1
53:18,20

shortcomings
15:22
show 39:1
shows 15:1,1
sic 34:9
sign 2:25 53:16
53:18
Signature 2:24
53:18,20
significant 25:22
signing 48:17
similar 28:14
simply 17:10
19:22 22:20
28:24 43:16
sir 5:18 8:3
12:10 16:15
sit 13:23 14:10
31:7 34:11,12
35:13,19 36:9
sitting 41:22
skip 18:8
solemnly 4:2
somewhat 14:17
18:8
sorry 8:8 39:19
sought 21:12
source 20:18
sources 12:15
15:1 19:18
43:9
South 1:20 2:3,8
19:7 53:11
speak 7:16 32:25
39:11
speaks 37:16
specific 7:22
17:16 18:3
23:8 36:22
37:7,13 38:16
41:8,20
specifically 6:20
9:15,24 12:13
20:5,7 22:10
23:14 37:6
40:18 41:8
spend 4:21

44:20
Spivey 2:7,19
3:4 6:13,17
7:10,13 18:19
20:8 46:7 47:7
47:12 48:10,12
53:10,13
SpiveyW@G...
2:7 53:10
spoke 6:24 7:15
46:7
spring 23:18
standpoint
15:23 25:22
Stanley 19:15
23:11
start 36:7
starting 9:18
state 1:23 11:1
11:15 13:5
26:7 49:2,24
50:2,9,24
stated 31:9
33:23
statement 18:17
18:19 37:1
statements
37:17
STATES 1:1
53:1
Stenographic
1:23 53:23
stenographica...
50:6
stipulated 48:16
STIPULATION
2:20
studies 23:8
STYLE 51:2
subject 22:5
27:15 32:23
subparts 36:25
Subpoena 19:3
subsequent
28:11
sufficient 38:8
39:7

suggest 26:3
suggesting 26:9
Suite 1:21 2:9
53:12
summarize
34:22 38:12
39:6
supplement
27:21 28:25
29:20
supplementati...
27:16
supplements
29:14
support 21:11
35:24 39:25
40:16,21
supports 35:5
38:11
sure 4:25 10:15
15:24 18:5
19:12 30:2
35:2,20 36:5
36:16 46:23
sustained 30:9
35:1
swear 4:3
sworn 4:8,10
49:7

**T**

T 1:10 2:17 3:3,7
3:8 4:9 48:15
48:15 49:6
51:2 52:10,23
53:7
tabbed 44:5,7
take 4:21,24
12:22 24:14
26:13 33:7
40:7,7 41:1
taken 51:3 52:24
53:14
takes 28:14
talk 19:10 29:2
32:15
talked 9:24

46:10
Tampa 1:2 2:4
52:19 53:2
target 27:25
task 35:22
tax 18:16 37:17
tell 20:15 37:5
44:1,25
terms 47:21
testified 4:11
22:11 44:13
testifying 8:1
11:18,22
testimony 4:3
8:22 24:9
29:16 36:21
41:24 47:15,19
52:4
texture 23:1
Thank 16:8
48:10 53:21
Thanks 5:12
thing 28:16
41:13 43:24
things 15:17
39:3
think 7:15 8:23
8:24 11:6,8
13:11,12 18:22
18:24,24 22:19
23:3 25:12
32:9 38:12
39:6,21 47:1,8
third 31:2,3
thought 42:10
tie 28:5
time 1:18 4:22
6:12 7:2 17:23
39:1 45:5 46:7
50:7
titled 37:3
today 5:9 13:24
44:22
told 23:24
top 19:1 37:11
total 44:18,25
45:1,6

totality 5:2,10
  46:23
training 8:17
  12:12
transaction 43:1
transcribed
  53:15
transcript 48:17
  50:9 52:4
  53:16,16
TRANSCRIP...
  52:1
Traurig 1:20 2:8
  6:10 53:11
trial 42:5
tried 34:3
truth 4:5,5
try 36:23
trying 9:6 20:12
  21:17 35:19
two 9:3,8 15:21
  25:8 39:24
  43:16 44:20
  47:8
type 37:20
typically 8:4,8
  8:11
typo 18:24

U

U 48:15
ultimate 9:20
  14:11
ultimately 19:12
  30:2 34:20
  36:9
umbrella 25:11
uncertainty
  47:10
unclear 9:20
underlain 21:9
underlie 32:14
underlies 38:5
underlying
  15:16 35:23
  36:4
undersigned

49:5
understand 7:19
  21:14 24:9
  27:24 29:7
  36:20 46:25
understanding
  10:11,15 20:17
  20:21 23:17
  25:20 32:18
  33:9
understood 13:3
  13:19 17:25
  35:22
UNITED 1:1
  53:1
unusual 14:17
  14:21
update 27:21
upwards 33:2
use 25:14 26:2
  26:16,17 40:10
  40:15
uses 25:23
usually 47:1
utilized 24:11

V

v 51:2 52:22
valid 26:10
  28:23 34:10
  35:15
Valles 18:18
valuation 25:21
  26:1 47:21
  48:1
valuations 48:2
value 10:8,18
  21:25 25:19
  26:21,24 32:16
  32:23 33:8
  39:3 42:19
  43:16
values 44:3
various 16:12
  30:1 32:3
Verified 18:11
vitae 3:3 6:6

12:20 16:2
void 39:5
vs 1:5 53:4

W

waived 48:17
walk 41:7
walking 4:22
want 25:5 46:23
  47:7,9
wanted 19:8
  23:22
wasn't 12:25
  33:20 39:5
waste 32:15,20
  33:11
way 13:6 17:13
  20:17 21:3
  30:14 32:2,21
  33:24 36:11
We'll 48:12
we're 5:20,23
  35:17 47:1
we've 37:4
website 42:18
websites 5:16,17
  19:20
Wednesday 1:16
week 27:20
Weinstein 6:13
went 41:14,19
  42:10,14
WILLIAM 2:7
  53:10
willing 46:19
witness 2:25 4:6
  4:7,10 11:18
  49:10 51:2
  52:23
WITNESS' 2:24
Wolpert 1:10
  2:17 3:3,7,8
  4:9,14 5:2 14:1
  17:22 29:12
  33:16 36:21
  41:6 43:25
  47:7 49:6 51:2

52:10,23 53:7
  53:14,17
word 9:1 17:6
work 8:11 9:22
  13:13 14:23
  24:3 28:2
  39:14,17
worked 6:12
working 23:17
  23:21
works 23:25
worried 25:17
  25:17
wouldn't 11:8
  15:10 22:24
  35:16
written 27:15
  36:6
wrong 30:23,25

X

Y

Yeah 18:24
  40:20
year 7:2
years 8:1
Yep 47:4
yesterday 44:21
  44:22

Z

zero 31:21,22

0

1

1 3:7 16:10
  29:19 33:3
  36:25 43:18,19
  43:21
1.8 34:13 35:4,7
  36:7,10 37:25
  38:23
100 20:16,22
11 36:17 37:10
11:17 1:19 48:20
114 52:18

12 37:11
13 1:16 51:3
  52:24 53:14
130 36:8
137 34:17 36:10
  38:1,23
13th 49:10
14 3:5
14th 7:3
157 3:3 5:24 6:1
  16:1 45:20
158 3:4 7:5,6
  44:12 45:19
  47:14
159 3:6 16:4,7,9
  17:15 36:17
  45:21
16 3:6
160 3:8 45:23
  46:1
161 3:9 45:25
  46:1
1st 5:15 27:8
  28:5,11,22,24
  29:14 34:3

2

2 17:4,16 43:18
2011 18:13
2014 18:15
2015 18:21
  26:14
2016 1:16 3:5,7
  7:3 16:10
  18:18 25:8,19
  26:10 27:10,11
  28:6,18 29:13
  29:19 49:11
  50:18 51:3
  52:24 53:9,14
2017 26:15
2019 1:24 49:25
  50:25
202,900 43:17
21 1:24 28:18
  29:13 44:4
  49:25 50:25

**21,000** 45:6
**21st** 25:7 28:12
  28:22,23 29:17
  40:3 43:22
**22** 18:18 33:4
  34:17
**22.5** 33:2 36:10
  40:7
**23** 44:7
**2309** 2:3
**24** 18:13 44:8
**26** 3:6,8 12:21
  16:11 18:5,6
  21:1 32:7 34:8
  36:18 45:20

**3**

**3** 53:9
**31** 18:6
**32801** 2:9 53:12
**33606** 52:19
**33629** 2:4
**350** 45:5
**3rd** 50:18

**4**

**4** 2:18 18:15,21
  19:2 43:8
**41** 44:4
**45** 3:8,9
**450** 1:20 2:8
  53:11
**47** 2:19
**48** 2:20
**49** 2:21

**5**

**5** 3:3
**50** 2:22
**51** 2:23 52:17
  53:18
**52** 2:24 52:17
  53:18
**53** 2:25

**6**

**6** 37:1
**6.2** 37:3 38:13

**6.2-I** 37:16
**6.2-II** 37:22
**6.8** 36:25
**60** 45:5
**650** 1:21 2:9
  53:12

**7**

**7** 3:4
**7,500** 43:18
**70** 34:16 36:7
**72** 36:10

**8**

**8:15-CV-0040...**
  1:5 53:4
**813.868.5130**
  52:19

**9**

**9:58** 1:18
**944824** 1:24
  49:24 50:24

INTEGRA REPORTING GROUP, LLC
Tampa, FL (813) 868-5130